**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 8, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LINDA HAYNES,

        Plaintiff-Appellant,

v.

LEVEL 3 COMMUNICATIONS,
LLC,

        Defendant-Appellee.

No. 04-1307

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 02-N-1694 (MJW))

Submitted on the briefs:

John R. Olsen of Olsen & Brown, L.L.C., Niwot, Colorado, for Plaintiff-
Appellant.

Lisa Hogan, Richard P. Barkley, Meghan W. Martinez of Brownstein Hyatt &
Farber, P.C., Denver, Colorado, for Defendant-Appellee.

Before **TACHA,** Chief Judge, **BALDOCK** and **O'BRIEN**, Circuit Judges.

**O'BRIEN**, Circuit Judge.

Linda Haynes filed suit against her employer, Level 3 Communications

(Level 3), following the termination of her employment as part of a reduction in force (RIF). She alleged violations of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213, Title VII of the Civil Rights Act (sex discrimination), 42 U.S.C. § 2000e, and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621. She also asserted a breach of contract claim. The district court granted summary judgment in favor of Level 3, concluding Haynes failed to timely file her ADA, Title VII and ADEA claims and declined to exercise supplemental jurisdiction over her breach of contract claim. We exercise jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

### Standard of Review

"We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court." *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1182 (10th Cir. 2003) (quotation omitted). Summary judgment is appropriate if the evidence presented by the parties demonstrates "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). An issue of fact is "genuine" if the evidence allows a reasonable jury to resolve the issue either way and is "material" when "it is essential to the proper disposition of the claim." *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001).

"The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Id.* (citations

-2-

omitted).  If the movant does not bear the burden of persuasion at trial, it "may make its prima facie demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.* (citations omitted).  If the moving party properly supports its motion for summary judgment, "the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts from which a reasonable jury could find in favor of the nonmoving party." *Id.*  At all times, the record, and all reasonable inferences drawn from it, are considered in the light most favorable to the party opposing the motion. *Id.*  With these standards in mind, we set forth the facts in the light most favorable to Haynes.

## Background

After eight and a half years as a top sales person at her former employer IXC, Haynes followed her boss, David Weigand, to work at Level 3 in March 1999.  Her title was "carrier sales manager" in the San Francisco office.[1]  Initially, she worked directly for Weigand, but following his promotion, Paul Larson became her supervisor.  At various times during Haynes' tenure at Level 3, Larson also supervised two other saleswomen, Mary Vargo and Cari Burich (located in the Los Angeles office), and two salesmen, Steve Stone and Shane Quivey.

---

[1] During the relevant time period, Level 3 was divided into three product sales groups — carrier, corporate and internet.

Shortly after Larson became the carrier products unit supervisor, he began to recruit Quivey, a thirty-one-year-old male working in the internet products unit. When Quivey came to work in the carrier products unit, Larson treated Quivey and Stone with a marked preference compared with the saleswomen.[2] Haynes alleges Quivey acted inappropriately and did not follow company procedures, yet Larson protected him. Haynes also observed that Larson was gradually taking customer accounts away from Vargo and giving them to Quivey. As a result, Vargo was unable to meet her sales quota. Vargo complained about the situation to Larson and Wiegand, pursuant to Level 3's "open door policy."[3] Shortly thereafter, Larson gave Vargo a poor performance evaluation and placed her on a "performance [improvement] plan (PIP)." (R. Vol. III at 413.) In February 2000, Vargo resigned.

While these events were taking place, Larson also began taking accounts away from Haynes and giving them to Quivey. Although Quivey was to give some of his accounts to Haynes in trade, he never did. Haynes claims Quivey also received favored treatment in the form of assignments to the best leads and better pricing for his clients.

---

[2] Unfortunately, the exact dates of many of the allegations are not in the record. It appears Larson became Haynes' supervisor in June or July 1999 and Quivey joined the carrier products unit in August or September 1999.

[3] Level 3 had a written "open door policy" whereby any employee could speak about any topic without fear of retaliation.

Beginning in early 2000, Haynes' health began to decline. Sometime in May 2000, Larson demanded she come to work against her doctor's advice, only to have her attend a meeting at which she was directed to give Quivey one of her most lucrative accounts. According to Haynes, this was a "watershed" moment. Haynes confronted Larson and accused him of discriminating against her on the basis of her age and sex. As Haynes testified, "I realized that it was going to be a turning point, that [Larson] knew that I knew what he was doing." (R. Vol. III at 239.) Thereafter, Larson began to criticize Haynes to customers and management, harming her relationships with her customers and Mike Lanza, Larson's direct supervisor. On May 18 or 19, 2000, Haynes complained to Lanza that Larson was discriminating against her by giving the benefits of her work to someone else.

Eventually, due to Larson's alleged discriminatory management, Haynes was unable to meet her sales quota. Larson informally counseled Haynes several times regarding her sales performance throughout 2000. By August 2000, Haynes met only a small percentage of her sales quota.[4] In early to mid- September, Larson met with Haynes and again informally counseled her on her performance.

On September 18, 2000, Haynes e-mailed Scott Roberts, Senior Vice-

---

[4] While Level 3 contends she met only seven percent of her sales quota, Haynes disputes this number, alleging the actual percentage was approximately thirteen.

President of Sales and Marketing, and asked to exercise the open door policy.[5]  In the e-mail, Haynes complained of  Larson's management style and his failure to support her.  On September 19, 2000, Haynes sent a second e-mail to Roberts explaining her position regarding Larson's lack of management skills in more detail and requesting help in resolving the problem.  She complained Larson's lack of support caused customers to get angry with her and, in turn, caused Larson to reassign her accounts to Quivey.  She also alleged Larson had been unavailable to help close deals, fell asleep during customer calls and had told her not to discuss her problems with upper management.  Several e-mails indicate Haynes continued to ask Roberts to assist her in receiving support and it appears Roberts responded appropriately.

On October 3, 2000, Larson issued Haynes a formal, written warning noting she had reached only fifty percent of her year-to-date quota.  On October 24, 2000, Roberts e-mailed Haynes to inform her he had asked Randy Hester, Director of Human Resources, to contact her regarding her request for an open door meeting.  On October 26, 2000, Haynes responded with another request for a meeting.  On November 1, 2000, Haynes and Hester talked via telephone.  In preparation for the meeting, Haynes forwarded the September 19, 2000 e-mail she had sent to Roberts detailing her complaints.  Following the two-hour call, Hester

---

[5] Haynes testified she had spoken to Roberts frequently regarding Larson's treatment of older women prior to the September e-mail.

telephoned Lanza and Larson to find out why Haynes' accounts had been moved. He was told some accounts were moved by upper management and others at the request of the customers. Hester did not investigate further.[6]

The next day, Lanza sent an e-mail to his staff, including Larson. The e-mail stated in relevant part:

> [N]o one is to take ANY issue to my superiors without first bringing it to my attention. I want to be very clear about this. Nothing goes over my head unless I have been made aware of it and AGREE that it should be escalated. If there is a part of this message that is unclear call me and I will be happy to clear up any confusion. I want a response back from each of you stating you have read this and understand it.

(Vol. III at 361.) Larson forwarded Lanza's message to Haynes, Burich and Quivey with his own admonishment, "Please make sure everything goes through Mike and I before it goes any higher." (*Id.*)

Eleven days later, on November 13, 2000, Larson placed Haynes on a PIP he devised with Hester's assistance. The PIP listed five objectives, including a requirement that Haynes "[m]eet or exceed 100% of [her] monthly sales quota . . . for December '00 and January '01." (R. Vol. III at 363.) It also stated, "[i]t is crucial you understand how important your required improvement is, since

---

[6] Level 3 vehemently disputes many of the facts alleged by Haynes. Roberts and Hester testified they were never aware that Haynes was complaining about sexual discrimination, rather they understood it as a complaint about her manager not giving her support and taking away her accounts. Haynes insists she told them both that the discrimination was based on her age and sex and informed them two other women had also been victims of such discrimination.

continued unsatisfactory sales performance will result in further disciplinary action." (Vol. III at 363.) Finally, the PIP informed Haynes if she discussed its terms and conditions with any other Level 3 employees, she was subject to immediate termination.

Nine days after Haynes was placed on the PIP, her physician informed Level 3 she was placing Haynes on a two week medical disability for consultation with specialists. Five days later, Haynes took a medical leave of absence. The first twelve weeks of leave were taken pursuant to the Family Medical Leave Act. After that time, Haynes took indefinite leave under Level 3's medical leave policy. She received short-term disability payments from Level 3's third-party insurance carrier through February 26, 2001. However, the third-party insurance carrier denied her request for long-term disability payments. It is undisputed Level 3 had no control or influence over this decision.

Haynes remained on medical leave until Level 3 terminated her employment on June 18, 2001, as part of a RIF. Larson and Lanza's employment, among others, was also terminated in the same RIF. Roberts made the decisions as to which employees would be terminated. One of the criteria for termination under the RIF was an employee's placement on a PIP.

Haynes filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on October 11, 2001. At her request, the EEOC issued a Notice of Right to Sue letter on June 27, 2002. On September 4,

-8-

2002, Haynes filed this action against Level 3 alleging she was terminated in violation of the ADA, Title VII and the ADEA. She also asserted a breach of contract claim. Following discovery, Level 3 moved for summary judgment on all of Haynes' claims. After supplemental briefing, the district court granted summary judgment in favor of Level 3. In so doing, it construed Haynes' complaint as incorporating two separate bases for her claims — her termination and her placement on the PIP. The district court denied relief, concluding: (1) the termination of Haynes' employment was not discriminatory because it was premised on her status under the PIP and it is uncontested that all employees under a PIP were placed on the list to be considered for the RIF, (2) the last action prior to the RIF was placing her on a PIP, (3) the PIP was an adverse employment action, (4) but it, and all other alleged discriminatory acts, were outside of the required 300-day time period for filing an administrative claim. After disposing of Haynes' federal claims, the district court declined to exercise supplemental jurisdiction over her breach of contract claim.[7] This appeal followed.

### Discussion

All three of Haynes' causes of action, Title VII, ADEA and ADA, require that she file a timely administrative claim within 300 days of the challenged

---

[7] On appeal, Haynes does not challenge the district court's refusal to exercise supplemental jurisdiction.

discriminatory action. Haynes filed her EEOC charge on October 11, 2001.

Therefore, the discriminatory actions on which she bases her claims must have

occurred on or after December 15, 2000. 42 U.S.C. §§ 12117(a); 2000e-5;

*Duncan v. Manager, Dep't. of Safety, City & County of Denver*, 397 F.3d 1300,

1308 (10th Cir. 2005) (Title VII); *Davidson*, 337 F.3d at 1183 (ADA); *Beaird v.

Seagate Tech., Inc.*, 145 F.3d 1159, 1174 (10th Cir. 1998) (ADEA). Generally, a

cause of action accrues "on the date the employee is notified of an adverse

employment decision by the employer." *Davidson,* 337 F.3d at 1187. However,

not every perceived indignity will rise to the level of an adverse employment

action triggering the 300-day limitations period. A "mere inconvenience or

alteration of job responsibilities" will not do. *Dick v. Phone Directories Co.,

Inc.*, 397 F.3d 1256, 1268 (10th Cir. 2005) (quotation omitted). Only "acts that

constitute a significant change in employment status, such as hiring, firing, failing

to promote, reassignment with significantly different responsibilities, or a

decision causing a significant change in benefits" will rise to the level of an

adverse employment action. *Id*. (quotation omitted). Nonetheless, "we liberally

interpret" whether an adverse employment action exists "and take a case-by-case

approach, examining the unique factors relevant to the situation at hand." *Id*.

(quotation omitted.)

We begin by identifying the allegations that constitute an adverse

employment action because such "discrete discriminatory acts are not actionable

if time barred, even when they are related to acts alleged in timely filed charges.

Each discrete discriminatory act starts a new [300-day] clock for filing charges

alleging that act." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113

(2002).

> The very precision of this requirement — not a year, not six months, not the state law statute of limitations for comparable causes of action — bespeaks Congress's concern. Title VII is not intended to allow employees to dredge up old grievances; they must promptly report and take action on discriminatory acts when they occur. Unlitigated bygones are bygones.

*Duncan*, 397 F.3d at 1308.

The crux of Haynes' argument on appeal is that the district court erred in

concluding the PIP was an adverse employment action that occurred outside the

time limitation. She maintains the only adverse employment action triggering the

300-day statutory limitations period occurred on the date of her termination. In

any event, Haynes argues that under *Morgan*, even if the PIP is an adverse

employment action, her allegations surrounding the PIP and all other previous

discriminatory actions are relevant as a backdrop for the ultimate determination as

to whether the termination of her employment was discriminatory and the RIF

merely a pretext.[8]

---

[8] Haynes raises numerous arguments on appeal that were not presented to the district court. A significant portion of her Opening Brief and Reply Brief is directed to her claim that her PIP was limited to a two-month period (*i.e.*, until January 2001). She reasons that, because the PIP was limited to two months, she was subject to additional adverse employment actions by (1) either being placed on a new PIP after January 2001, (2) extending the time frame for the PIP without

Haynes is correct that the statute does not "bar an employee from using prior acts as background evidence in support of a *timely* claim." *Morgan,* 536 U.S. at 113 (emphasis added). Nonetheless,

> such background evidence cannot suffice [to establish a timely claim] where [there is] no evidence of discriminatory purpose other than (at most) [a] discrete time-barred decision . . . . To decide otherwise would completely undo *Morgan*'s insistence that each discrete discriminatory act starts a new clock for filing charges alleging that act.

*Law v. Continental Airlines, Corp., Inc.*, 399 F.3d 330, 334 (D.C. Cir. 2005). Therefore, as our first step, we will examine Level 3's discriminatory acts as alleged by Haynes prior to her termination to determine whether any constitute time-barred discrete adverse employment actions.

---

her knowledge or (3) being terminated when she was not actually on a PIP. Haynes also insists the district court erroneously characterized the PIP as automatically causing her termination. She now insists it was only one reason she was included in the RIF. None of these arguments were raised below. Indeed, Haynes' theory below was simply and repeatedly based on a simple sequence of events:

> In sum, plaintiff was laid off because she was put at the top of the layoff list which, in turn, was because she had been placed on a corrective action plan, which, in turn, was because she complained to human resources about discrimination and mistreatment under the 'open door' policy.

(R. Vol. II at 193). While Haynes' new theories may seem more attractive at this stage of the proceedings, we will not consider them on appeal. *Davidson*, 337 F.3d 1179, 1188 (10th Cir. 2003); *Gorman v. Carpenters' & Millwrights' Health Benefit Trust*, 410 F.3d 1194, 1202 (10th Cir. 2005).

A.    Discriminatory Acts Prior to Placement on the PIP

Haynes' allegations of Larson's actions prior to placement on the PIP may

be parsed into three categories: (1) a request to come to work while ill; (2) lack of

managerial support as compared with that provided to the male employees; and

(3) reassignment of her accounts.  As to the first two categories, we agree with

Haynes that they are not the type of actions that would begin the statutory

limitations period since she has not alleged, and the record does not reflect, these

actions were anything but an inconvenience.

Larson's repeated removal of Haynes' accounts, however, paint a different

picture.  As Haynes repeatedly stated, these actions directly caused a significant

change in her employment status and benefits.  According to Haynes, Larson's

discriminatory actions caused Quivey to receive the rewards of her work and,

conversely, she was unable to meet her sales quotas.  Although she did not

identify the precise accounts unfairly removed, the dates they were transferred to

Quivey or the amount of income she lost as a result of the transfers, Haynes

clearly knew the discriminatory nature of Larson's actions and the resulting

detrimental effect to her income.[9]  Indeed, in a November 7, 2000 e-mail to

---

[9] The record includes several e-mails dated August 13, 2000, November 7, 2000, and September 17, 2000, in which Haynes complains of the transfer of her accounts to Quivey.  In addition, Haynes also testified that the removal of an account in May 2000 was a "watershed" moment.  Therefore, while it is not clear exactly when her accounts were transferred, the record indicates such transfers began, at the latest, in May 2000 and ceased in November 2000.

Larson, Haynes stated, "this has impacted my sales output tremendously, as the work I've done is not reflected in my base and someone else is now getting paid on much of my work." (R. Vol. III at 333.) Because each removal of an account constituted an actionable adverse employment action, Haynes was required to file an administrative charge within 300 days of each removal. She did not do so. Thus, any claim based on the removal of her accounts is time-barred.

B.    Placement on the PIP

In essence, the district court concluded Haynes' placement on a PIP was *per se* an adverse employment action because it constituted a disciplinary action in the form of a written warning. Most courts that have considered whether a PIP, standing alone, is an adverse employment action have found it is not. *Givens v. Cingular Wireless*, 396 F.3d 998, 998 (8th Cir. 2005) ("[P]lacing [an employee] on a 'performance improvement plan,' without more, did not constitute an adverse employment action."); *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) ("[F]ormal criticism or poor performance evaluations are not necessarily adverse actions and they should not be considered such if they did not affect the employee's grade or salary."); *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002) (the possibility of termination mentioned in the plaintiff's PIP "was contingent on future developments, rather than being a present plan or decision" and therefore did not constitute an adverse employment action supporting a constructive discharge claim.).

Although the district court recognized the existence of this non-binding precedent, it determined the Tenth Circuit had reached the opposite conclusion. Relying on *Hysten v. Burlington N. & Santa Fe Railway Company*, 296 F.3d 1177, 1183 (10th Cir. 2002), and *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998), it held "[Haynes] could have filed a charge of discrimination immediately after being placed on the PIP because a written warning in the Tenth Circuit constitutes an adverse employment action." (R. Vol. IV at 61.) We disagree with the district court's interpretation of our precedent and expressly join our sister circuits in holding a PIP, standing alone, is not an adverse employment action.

A written warning *may* be an adverse employment action only if it effects a significant change in the plaintiff's employment status. For example, in *Roberts*, the defendant had peppered plaintiff's file with "twenty warning letters," and the record demonstrated "that the more warnings an employee received, the more likely he or she was to be terminated for a further infraction." 149 F.3d at 1104.[10] Thus, the effect on the plaintiff's employment status was an immediate placement in an at-risk status. The facts in this case do not demonstrate that Haynes' placement on the PIP in November had any immediate effect on her employment

---

[10] The facts in *Hysten* are not as clear. It appears the plaintiff's retaliation claim relied on a written Level 1 reprimand issued approximately two weeks after he filed a discrimination suit. The effect of the reprimand is not, however, set forth in the opinion. We can assume the record indicated an immediate adverse consequence as a result.

status. She was not demoted, her pay did not change and her responsibilities were not significantly modified. Instead, she was presented with clear goals to achieve her continued employment.

She also concedes no one at Level 3 anticipated the economic downturn that would result in the RIF seven months later. Further, no one could have predicted that Haynes would be unable to meet the PIP due to her subsequent unforeseen medical leave. Therefore, her placement on the PIP had no apparent tangible effects other than the requirement she meet her sales quota and a plan to assist her in her efforts. Consequently, Haynes' placement on a PIP was not an adverse employment action. *See Dick*, 397 F.3d at 1270 (holding a "single write-up is not an adverse employment action.").

C.    Discriminatory Discharge

There is no question that Haynes' termination from Level 3 is an adverse employment action that occurred within the 300-day statutory time period. However, the district court determined Haynes failed to present evidence of a discriminatory intent,[11] *i.e.*, that her inclusion in the RIF was based on her age,

_____

[11]    To prevail on a claim of age discrimination in the RIF context, a claimant must show: "(1) the claimant is within the protected age group; (2) he or she was doing satisfactory work; (3) the claimant was discharged despite the adequacy of his or her work; and (4) there is some evidence the employer intended to discriminate against the claimant in reaching its RIF decision." *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1137 (10th Cir. 2000). "Under the ADA, a plaintiff must show (1) that he is disabled within the meaning of the ADA; (2) that he is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) that he was discriminated

disability or sex, respectively, because her termination was pursuant to a neutral policy.  We agree.

In *United Air Lines, Inc. v. Evans*, Evans, a flight attendant, was forced to resign in 1968 due to United's policy of prohibiting married flight attendants. 431 U.S. 553, 554 (1997).  In 1971, United's policy was found to be unlawful. *Id*.  In 1972, Evans was rehired but was denied seniority credit for her past service.  *Id*. at 554.  She filed suit alleging the discriminatory policy forcing her to resign was the direct cause of her inability receive the benefits attendant to her seniority in her current position.  *Id*.  The question before the Court was whether her failure to file a charge within 90 days of her 1968 separation caused her claim to be time barred and foreclosed Title VII relief.  *Id*. at 556.

Evans argued, *inter alia*, that "the seniority system [gave] present effect to the past illegal [policy] and therefore perpetuate[d] the consequences of forbidden discrimination."  *Id*. at 557.  The Court rejected this argument because the policy to refuse seniority to rehired employees applied equally to those who had terminated their employment because of discriminatory and non-discriminatory

---

against because of his disability." *Davidson*, 373 F.3d at 1188 (quotations omitted). To prevail on a claim alleging termination under Title VII, the plaintiff "must first establish a prima facie case, demonstrating that:  (1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of discrimination." *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004).

practices, notwithstanding their sex. *Id*. at 558. The Court recognized "the seniority system [gave] present effect to a past act of discrimination." *Id*. Nonetheless, "United was entitled to treat that past act as lawful" when Evans failed to file a timely charge of discrimination. *Id*. The Court explained that the past act "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences." *Id*. Because the present (timely) employment decision was "neutral in its operation," the past discriminatory policy could not be the basis of her claim. *Id*.; *see also Delaware State College v. Ricks,* 449 U.S. 250, 258 (1980) (Plaintiff neither alleged nor proved "that the manner in which his employment was terminated differed discriminatorily from the manner in which the College terminated other professors who also had been denied tenure.").

Similarly, in *Jorge v. Rumsfeld*, the plaintiff, Jorge, was employed by the Army and Air Force Exchange Services in the commissary program for military personnel. 404 F.3d 556, 559 (1st Cir. 2005). In 1979, she became the retail manager of a Base store, Toyland, and remained there for almost twenty years. At the age of fifty-one, she elected to make a lateral transfer to another store on the Base, where she was a model employee until 1998. However, the assignment of a new supervisor caused Jorge to complain about the supervisor's practices, to which the supervisor allegedly responded with derogatory comments about her

-18-

age. While Jorge was on vacation, the supervisor unilaterally transferred her back to Toyland, filled her position with a younger, less experienced male and did not offer an explanation upon her return. *Id*. Jorge refused to report to Toyland, using all her leave and sick time resisting the transfer. *Id*. at 560. Eventually, she was given the option of either reporting to Toyland or taking early retirement. She submitted a notice of involuntary early retirement and filed suit alleging constructive discharge in violation of the ADEA and Title VII. *Id*.

The court determined Jorge's claim accrued at the time she was transferred, not at her resignation, even though her transfer was not an adverse employment action.[12] *Id*. at 562. The court reasoned:

> Jorge's troubles evidently stemmed from the sequence of events exemplifying the harassing behavior of her new supervisor. That sequence of events began in 1998 and culminated in the order transferring her to Toyland. Jorge refused to accept that transfer, even though it entailed no loss of pay, benefits, status, or the like . . . . By all accounts, it was the refusal to report for work and the passage of time that led to [the] ultimatum, and Jorge does not suggest that this action was anything other than standard operating procedure.

*Id*. "Absent such an allegation, the plaintiff's loss of employment was merely an 'inevitable consequence' of the earlier (time-barred) . . . decision, and could not constitute a separately actionable event." *Id*. at 563. (*quoting Ricks*, 449 U.S. at

_____

[12] We need not and do not express an opinion on the court's determination that an action may accrue even though no adverse employment action has occurred.

257-58). "In short, the critical datum is the point in time at which the discriminatory act occurred, not the point at which its effects became most injurious . . . . The mere continuity of the employment relationship, in and of itself, is not enough to prolong the life of a cause of action." *Id.* (quotation omitted).[13]

Again, in *Law*, employees claimed a discriminatory failure to promote occurring outside the appropriate time limitations was the cause of their lower pay checks, each a discrete discriminatory action. 399 F.3d at 332-33. The court rejected the claim because the determination of the amount of the paychecks was made pursuant to a neutral policy. *Id.* at 333. While the court recognized the earlier failure to promote could be used as background under *Morgan*, it concluded the allowance of a claim based solely on a time-barred discrete employment decision would "undo" *Morgan's* insistence that each discrete act start a new clock. *Id.* at 334.

These cases instruct, and we agree, that Haynes cannot use Larson's alleged

---

[13] The Supreme Court has noted, "[t]here may be circumstances where it will be difficult to determine when the time period should begin to run. One issue that may arise in such circumstances is whether the time begins to run when the injury occurs as opposed to when the injury reasonably should have been discovered." *Morgan,* 536 U.S. at 114 n.7. In exceptional circumstances, "the 300-day period of limitations for filing a charge with the EEOC may be adjusted by equitable doctrines such as waiver, estoppel and equitable tolling." *Davidson*, 337 F.3d at 1188. Haynes wisely did not raise equitable tolling before the district court or on appeal. The record reveals she clearly believed Larson's actions were discriminatory as early as May 2000, well over a year before she brought her claims.

intent in performing time-barred discrete actions resulting in the PIP,[14] to attach

discriminatory intent or pretext to the termination decision based on a neutral policy.

Haynes has failed to allege any discriminatory act on or after December 15, 2000.[15]

She does not claim that a PIP was outside standard operating procedure to address a

failure to meet her sales quota. Neither has she alleged that Level 3 did not even-

handedly include all employees currently on a PIP in the RIF. Finally, Haynes

presented no evidence that any other employees on a PIP were spared in the RIF. As

---

[14] Haynes argues that, because the PIP was not an adverse employment action, she had no opportunity to bring a claim until her claim ripened at the time of her termination in June. As discussed above, Haynes could have brought he claim as early as May 2000 and as late as 300 days from November 2000. We note Haynes concedes that, at the time she was placed on the PIP, she had failed to make her sales quotas, but places the cause for her poor performance solely upon Larson's previous discrete acts of discrimination. Thus, her allegations only underscore the fact that the PIP was an inevitable consequence of the alleged prior adverse employment actions, for which she did not file a timely charge. *See Ricks*, 449 U.S. at 257-58 ("It appears that termination of employment at Delaware State is a delayed, but inevitable, consequence of the denial of tenure.").

[15] In her opening brief, Haynes alleges five discrete adverse employment actions (other than being placed on the PIP) occurring within the time limitations. First, she alleges the PIP was extended or Level 3 imposed a new PIP. These arguments were not presented to the district court. Therefore, we will not consider them here. Second, she contends she was fired while on approved sick leave. While it is true Level 3's policy does not allow someone to be terminated *because* he or she is on sick leave, Level 3 consistently stated Haynes was terminated during the RIF because of the PIP, a fact admitted by Haynes. Haynes' third allegation centers on the failure to approve long-term medical leave. However, it is uncontested that Level 3 was not involved in this decision. Haynes' fourth and fifth alleged adverse employment acts are her placement on the list to be included in the RIF and her termination. As stated above, Haynes fails to show these acts to be discriminatory, as all employees in her situation were treated similarly.

a result, she fails to demonstrate any timely inference of discrimination in her inclusion in the RIF. Accordingly, we affirm summary judgment in favor of Level 3 on her claims of unlawful discharge.[16]

D.   Retaliation

Haynes also claims her inclusion in the RIF was in retaliation for her complaints of discrimination under Level 3's open-door policy. To succeed on a claim of retaliation a plaintiff must show: "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Argo v. Blue Cross & Blue Shield of Kan., Inc.,* 2006 WL 1806605 at *7 (10th Cir. 2006) (10th Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405 (2006)) (footnote omitted). Here, Haynes' meeting with Hester occurred on November, 1, 2000. She was placed on the performance improvement plan on November 13, 2000 and terminated June, 2001, over seven months later.

"A causal connection may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (quotation omitted). Standing alone, temporal proximity between the

_____

[16] Given our determination that summary judgment is appropriate on this basis, we need not address whether the district court erred in determining Haynes was not "disabled" under the ADA or whether she waived this issue on appeal.

protected activity and the retaliatory conduct must be very close in time. Otherwise, "the plaintiff must offer additional evidence to establish causation." *Id*. A seven-month period between protected activity and adverse action will not, by itself, establish causation. *See Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir. 1999) ("[A] three-month period, standing alone, is insufficient to establish causation.").

Haynes argues the temporal proximity is sufficient here because Level 3 could not "immediately" terminate her while she was on medical leave, and therefore, "[t]he company's opportunity to camouflage plaintiff's termination within an innocent-looking RIF did not present itself until a RIF was scheduled." (Appellant's Br. at 33.) Such speculative argument is not only insufficient, it defies logic.

Assuming Larson's decision to place Haynes on the PIP was because she had spoken out, such assumption does not establish an inference that Larson's motive carried over to Roberts' decision, seven months later, to include her in the RIF. "An employer's refusal to undo a discriminatory decision is not a fresh act of discrimination." *Croy v. Cobe Labs, Inc.*, 345 F.3d 1199, 1203 (10th Cir. 2003) (quotation omitted); *see Stepney v. Naperville Sch. Dist. 203*, 392 F.3d 236, 240 (7th Cir. 2004); *Stewart v. Booker T. Washington, Ins.*, 232 F.3d 844, 853 (11th Cir. 2000); *Lever v. Northwestern Univ.,* 979 F.2d 552, 556 (7th Cir.1992). Indeed, the facts indicate no causal connection between Larson's alleged retaliatory decision and Roberts' neutral application of policy.

Haynes admits that, at the time Larson acted, neither he nor anyone else at Level 3 anticipated the future RIF or was aware the PIP would expose Haynes to collateral vulnerability regarding her employment. (Appellant's Br. at 20.) (She concedes "[N]ot even the manager who placed plaintiff on the original PIP could predict that it was a precursor to plaintiff's termination.") Two weeks later, Haynes left work on medical leave. Haynes' assertion that her medical leave prevented her immediate termination is refuted by the fact she was on medical leave at the time she was included in the RIF. Haynes does not dispute Level 3's policy whereby persons under a corrective action plan were chosen to be placed on the list for inclusion in the RIF. Haynes does not aver there were employees exempted from this policy or that some employees under a corrective action plan were not fired. In short, Haynes has not shown any connection between Larson's motivation placing Haynes on the PIP and Level 3's decision to include all employees on a corrective action plan as primary candidates and their ultimate inclusion in the RIF. *See Manning v. Chevron Chemical Co., LLC.*, 332 F.3d 874, 884 (5th Cir. 2003) (applying a general policy to an employee is not retaliation), *cert. denied*, 540 U.S. 1107 (2004). Thus, she has failed to establish the causation element of her retaliation claim.

## Conclusion

In sum, to the extent Haynes' claims rely on her discharge, she fails to establish the discriminatory intent necessary for a prima facie case. To the extent Haynes' claims are based on Larson's actions, her claims are untimely. Accordingly,

we AFFIRM summary judgment in favor of Level 3.