FILED
United States Court of Appeals
Tenth Circuit

**July 30, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

STUART A. GOLDSTEIN,

Plaintiff - Appellant,

v.

SPRINT UNITED MANAGEMENT
COMPANY, SPRINT
CORPORATION,

Defendants - Appellees.

No. 06-3379
(D.C. No. 05-CV-2360-JWL)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **HENRY**, **EBEL**, and **TYMKOVICH**, Circuit Judges.

After eighteen years of employment, Defendants-Appellees Sprint United

Management Company and Sprint Corporation (collectively "Sprint") laid off

Plaintiff-Appellant Stuart A. Goldstein as part of a reduction-in-force ("RIF").

Goldstein alleges that, in doing so, Sprint unlawfully terminated him (1) because

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). This order and
judgment is not binding precedent, except under the doctrines of law of the case,
res judicata, and collateral estoppel. It may be cited, however, for its persuasive
value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

of his age (48), (2) because Sprint regarded him as a person disabled from back problems, and (3) in retaliation for his making age discrimination complaints. The district court granted Sprint summary judgment on all three claims. Having jurisdiction to consider this appeal under 28 U.S.C. § 1291, we AFFIRM.

## I. BACKGROUND

The evidence, viewed in the light most favorable to Goldstein as the non-moving party, see Seegmiller v. LaVerkin City, 528 F.3d 762, 766 (10th Cir. 2008), indicated the following: Goldstein began working for Sprint in 1984. During his eighteen-year tenure with Sprint, Goldstein held several marketing and advertising positions. In his last position, senior proposal manager in the business supply group, Goldstein was a first-line manager supervising up to ten other employees.

Until March 2002, Goldstein had always received positive performance reviews. On March 1, 2002, however, Randy Bryson, who had supervised Goldstein during the final three months of 2001, gave Goldstein a review indicating his performance had fallen below Sprint's expectations and required improvement. This evaluation placed Goldstein in the bottom 10% of Sprint employees and made him vulnerable to any reductions-in-force.

Goldstein protested this evaluation in writing to Bryson, Greg Corwin, Goldstein's supervisor at that time, and a human resources ("HR") employee, specifically wondering "whether this is age discrimination, personal

2

discrimination, or the desire to unjustly identify me as a future RIF candidate." As a result of Goldstein's written objections, Bryson apologized for the review, admitted his behavior had been inappropriate and explained that Jed Dodd, Bryson's supervisor, had already reprimanded Bryson for the review he had given Goldstein. Dodd, too, apologized to Goldstein, and indicated to others that "errors in judgment were made by my management team." Based upon input from Goldstein's previous supervisor, who had actually supervised Goldstein for most of the year under review, Bryson raised Goldstein's evaluation to indicate that he was meeting Sprint's expectations. Bryson also assured Goldstein that his job was safe. Nevertheless, both Dodd and Bryson refused to change the evaluation to the extent it placed Goldstein in the lowest performing 10% of Sprint employees.

Less than a week after Goldstein's 2001 performance review had been revised, Goldstein's supervisor, Greg Corwin, "accidentally" sent Goldstein and others within Goldstein's work group what was supposed to be a confidential email from Corwin to Bryson. That email indicated that, out of the 120 Sprint employees in Bryson's department, only Goldstein would be let go during a proposed reorganization.

When Goldstein confronted Bryson with this information, Bryson told Goldstein he had 90 to 120 days to find a new position within the company or he was "gone." Goldstein again protested to Dodd and an HR employee that his

3

being let go was the result of age discrimination and was in retaliation for the age discrimination complaint he had voiced several weeks earlier. Dodd again apologized to Goldstein and assured him that he was safe during the upcoming reduction-in-force. Dodd, however, reiterated that Goldstein's evaluation, placing him in the lowest 10% of Sprint employees, would not change "because it is an accurate reflection of where management believes you fall relative to your peer group."

In March or April 2002, Goldstein was assigned to another supervisor, Susan Odneal. In May, Goldstein called in sick for two days when his back went out. Although Goldstein reported his absence to Bryson's executive assistant, Bryson nevertheless conferred with the HR department about terminating Goldstein because he had "abandoned" his job.

Goldstein's back problems stemmed from a ruptured disc. On his doctor's recommendation, Goldstein took short-term disability leave for several months, beginning in May 2002. During his disability leave, several of Goldstein's supervisors expressed skepticism about whether his back condition was really disabling.

Goldstein's short-term disability leave expired November 17, 2002. When he did not return to work immediately, Goldstein's supervisor Odneal and an HR employee called Goldstein to discuss his options, which included returning to work, taking long-term disability, or being terminated. Goldstein explained that

4

his doctor had advised him to remain off work until January 3, 2003, but Goldstein agreed to return to work immediately in order to keep his job. When he did return to work, Goldstein was supervising only half the number of employees he had previously supervised.

In March 2003, Odneal gave Goldstein his 2002 performance review, ranking him quite low. Odneal specifically noted that Goldstein's "involvement with the team was somewhat lacking. He experienced [short term disability] for half the year, missing much activity during the year." According to Goldstein, Odneal further explained to him that "we have to have a certain number of people in the various rankings and you're the lucky guy. You're it. You were the easy one because you were out on disability, so it's just how . . . it shook out."

In July 2003, Goldstein began reporting to still another supervisor, Michael Gochis. In September or October 2003, Gochis gave Goldstein an "interim" evaluation, indicating that Goldstein was meeting expectations.

In August and September 2003, Sprint underwent a major reorganization. This reorganization took place in several steps. First, Sprint vice-presidents and directors determined the new organizational structure the company would adopt. Then Sprint grouped its employees into pools designated for each newly created group within the chosen organizational structure. "Essentially the pools were all employees who did the work that was going to reside in that specific [newly created] organization." All current Sprint employees were placed in a pool, even

5

though the reorganization also contemplated a reduction-in-force. The vice presidents and directors then chose, from among the available employees within each pool, the people who would fill the positions within the new organizational groups. The reorganization ultimately involved five organizational levels: Layers 1 and 2 were the corporate officers; Layer 3 included the directors; Layer 4 was the first-line managers, such as Goldstein; and Layer 5 was the non-supervisory employees.

Goldstein and the five people he supervised were initially included in the pool for Sprint's new marketing division. At the last minute, however, Goldstein and his group were transferred into the new finance division and included in the pool of employees available for the finance department's "pricing" group supervised by Holly Valenta. Because Goldstein's group was not added to the finance pool until the last minute, however, Valenta had already chosen all of her Layer 4 managers and had received management's and the legal department's approval of those managers. Valenta, therefore, did not select Goldstein for any Layer 4 managerial position within her newly formed pricing group. Goldstein was then placed on a list of candidates available for Layer 5, non-managerial positions, but he was not selected to fill any of those openings.

There was also a redeployment list of employees displaced by this reorganization, from which supervisors and managers throughout the company could fill openings. But that list was circulated on October 24, 2003, and

managers had to make selections from that list by October 27. Because Goldstein's group was not added to the finance pool until October 28 or 29, Goldstein's name was not on that list when it was circulated.

Those employees who had not been slotted for a position in the newly reorganized finance department could still look elsewhere throughout the company for other positions. Although Goldstein specifically sought several such positions, he was never chosen to fill any remaining job openings. Sprint, therefore, notified Goldstein in November 2003 that his employment would be terminated, effective December 31, 2003.

## II. STANDARD OF REVIEW

The district court granted Sprint summary judgment on Goldstein's claims. This court reviews that summary judgment decision de novo, viewing the evidence in the light most favorable to the non-moving party, Goldstein. See Seegmiller, 528 F.3d at 766. Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## III. ANALYSIS

Goldstein alleged three claims: (1) age discrimination, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-34; 2) retaliation for engaging in activity protected under the ADEA; and 3) disability

discrimination, in violation of the Americans with Disabilities Act ("ADA"), 42

U.S.C. §§ 12101-12213.[1]  Goldstein seeks to prove these claims using indirect or

circumstantial evidence.  See Montes v. Vail Clinic, Inc., 497 F.3d 1160, 1173

(10th Cir. 2007).  We, therefore, apply the three-part McDonnell Douglas[2]

burden-shifting analysis:

> [A] plaintiff must first establish a prima facie case of discrimination. Once he or she does so, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  If the defendant satisfies its burden, the plaintiff must then show that the defendant's proffered justification was simply pretext for unlawful discrimination.

Montes, 497 F.3d at 1173 (citations omitted).

## A.     Age discrimination

The ADEA protects individuals who are "at least 40 years of age," and

makes it "unlawful for an employer . . . to discharge any individual . . . because

of such individual's age."  29 U.S.C. §§ 623(a)(1), 631(a).  To succeed on his

ADEA claim, therefore, Goldstein "must prove that his . . . discharge was

motivated, at least in part, by age."  Hinds v. Sprint/United Mgmt. Co., 523 F.3d

1187, 1195 (10th Cir. 2008).

---

[1]Although on appeal Goldstein suggests he also asserted a retaliation claim under the ADA, he never pled such a claim in his complaint.  Nor did the pretrial order include an ADA retaliation theory of recovery.  Accordingly, like the district court, we do not address ADA retaliation.

[2]McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

8

In order to establish a prima facie age discrimination claim in the context of a RIF, Goldstein must show that he "(i) was within a protected age group, (ii) was doing satisfactory work, (iii) was discharged despite the adequacy of his . . . work, and (iv) has some evidence the employer intended to discriminate against him . . . in reaching its RIF decision." Id. Goldstein has established the first three elements: he was over forty at the time of the RIF, he was performing satisfactory work, and Sprint, nevertheless, discharged him.

To establish the fourth element, Goldstein must show that, after the RIF, Sprint continued to employ younger employees in positions for which Goldstein was qualified. See id. at 1196; see also Stone v. Autoliv ASP, Inc., 210 F.3d 1132, 1137-38 (10th Cir. 2000). "It is the fact that the employer . . . decided to retain similarly situated younger employees while discharging an older employee that gives rise to an inference of discrimination." Hinds, 523 F.3d at 1196. The district court held that Goldstein had made this showing. On appeal, Sprint challenges that determination, asserting that Goldstein failed to present any evidence that it retained similarly situated younger workers instead of Goldstein. We do not need to resolve this issue, however, because even assuming that Goldstein did prove a prima facie case under the ADEA, he failed to establish a triable issue concerning pretext.

Sprint asserted a legitimate, non-discriminatory reason for terminating Goldstein: Valenta had already filled the managerial positions in her organization

9

before Sprint transferred Goldstein and his group into the finance pool, and Goldstein did not have any finance experience, which Valenta's already-seated managers had. The burden, then, shifted back to Goldstein to show that Sprint's proffered reasons from terminating him were a pretext for discrimination. See Montes, 497 F.3d at 1173.

"Pretext exists when an employer does not honestly represent its reasons for terminating an employee." Miller v. Eby Realty Group LLC, 396 F.3d 1105, 1111 (10th Cir. 2005). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Riggs v. AirTran Airways, Inc., 497 F.3d 1108, 1118 (10th Cir. 2007) (quotation omitted).

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48 (2000) (quotation omitted).

Goldstein asserts that Sprint's reasons for terminating him are unworthy of belief because Sprint actually gives two conflicting reasons why Valenta did not

10

select him for a position in her pricing group—she had already filled all of her managerial positions before Goldstein was transferred into the finance pool and Goldstein was not as qualified to work in the finance division as the managers Valenta had already chosen. Because evidence that an employer gave inconsistent reasons justifying its challenged action is an "indication of pretext," Whittington v. Nordam Group Inc., 429 F.3d 986, 994 (10th Cir. 2005), such a showing would ordinarily be enough to survive summary judgment, see Reeves, 530 U.S. at 148. Nonetheless, "there will be instances where, although the plaintiff has established a prima facie case [of age discrimination] and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." 530 U.S. at 148; see also Montes, 497 F.3d at 1173 n.18.

> Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

Reeves, 530 U.S. at 148-49;[3] see also Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d 1160, 1169 (10th Cir. 2007).

_____

[3]Although Reeves was addressing a motion for judgment as a matter of law, see 530 U.S. at 137, 148, the standard for such a motion is the same as the standard applicable to the summary judgment motion at issue here. See Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d 1160, 1168 n.9 (10th Cir. 2007).

11

In this case, the two explanations offered by Valenta are not necessarily inconsistent. That is, there is nothing inconsistent with Valenta's statement that she had already filled her openings and Lampe's statement that he did bring Goldstein's name to Valenta and Valenta determined that Goldstein was not more qualified than the people she had already selected.

There is no dispute that Valenta had already named her managers at the time Goldstein was transferred into the finance pool, and that she had received upper management's approval to offer those employees the positions. In addition, there is no evidence that Valenta was aware of Goldstein's age when she had the chance to, but did not, select him to fill one of her manager position. A reasonable factfinder could not infer age discrimination from this evidence. See Swackhammer, 493 F.3d at 1169.

In support of his pretext argument, Goldstein points to evidence indicating that Sprint did not transfer his group into the finance pool until the last minute and, as a result, his name was not included on the redeployment list circulated throughout the company. But, again, there is no evidence indicating that these events were the result of any discriminatory animus.

Finally, Goldstein relies on the fact that the district court noted that he had "come forward with evidence from which a reasonable jury could conclude that plaintiff's former supervisors," most notably Bryson and Odneal, "desired to terminate [Goldstein's] employment and that they desired to do so based on

12

[Goldstein's] age," among other reasons.[4] But Goldstein fails to establish any link between Bryson's and Odneal's earlier conduct and Sprint's decision to terminate Goldstein's employment during the 2003 reorganization. In particular, there is no evidence indicating Bryson or Odneal had any input into the decision to terminate Goldstein's employment during the 2003 RIF, or in the decision to transfer Goldstein's group at the last minute to the finance division; nor is there any evidence that the earlier performance reviews that Bryson and Odneal gave Goldstein factored into the RIF decision.

For these reasons, we conclude the district court did not err in granting Sprint summary judgment on Goldstein's age discrimination claim.

## B. Retaliation under the ADEA

The ADEA also makes it "unlawful for an employer to discriminate against any of his employees . . . because said individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or litigation under" the ADEA. 29 U.S.C. § 623(d). In order to establish a prima facie case of such retaliation, Goldstein must show that: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action.

---

[4]There is little or nothing in the record that we have found to support the district court's conclusion that Bryson and Odneal were motivated, even in part, by an animus against Goldstein because of his age.

13

See Hinds, 523 F.3d at 1202.  Goldstein satisfied the first two elements—he complained about age discrimination to his supervisors and the HR department. And Sprint terminated his employment.

Nevertheless, Goldstein failed to establish the third element, a causal connection between the protected activity and his termination.

> A causal connection may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.  Standing alone, temporal proximity between the protected activity and the retaliatory conduct must be very close in time.  Otherwise, the plaintiff must offer additional evidence to establish causation.

Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1228 (10th Cir. 2006) (citations, quotations omitted), cert denied, 127 S. Ct. 1372 (2007).  The temporal proximity between Goldstein's age discrimination complaints, occurring in March 2002, and Sprint's decision to terminate his employment, made approximately twenty months later in November 2003, was insufficient, by itself, to establish the requisite causal connection.  See id. ("A seven-month period between protected activity and adverse action will not, by itself, establish causation.").  This is true even if Goldstein's short-term disability leave, from May through November 2002, is not counted.  See Wells v. Colo. Dep't of Transp., 325 F.3d 1205, 1217 (10th Cir. 2003) (declining to consider time employee was on medical leave after complaining about her supervisor; noting there was no reason for supervisor to retaliate until the employee

14

returned to work from medical leave). Goldstein returned to work in December 2002 and Sprint terminated him as part of the RIF almost a year later.

Goldstein argues that he has, nevertheless, shown a pattern of retaliatory conduct that ensued following his age discrimination complaints sufficient to establish a causal connection between those complaints and his later termination. This court has recognized that the "close temporal proximity" usually necessary to support a retaliation claim "must not be read too restrictively where the pattern of retaliatory conduct begins . . . soon after the filing of [a] complaint and only culminates later in actual discharge." Marx v. Schnuck Mkts., Inc., 76 F.3d 324, 329 (10th Cir. 1996) (addressing retaliation claim asserted under the Fair Labor Standards Act); see also Piercy v. Maketa, 480 F.3d 1192, 1198-99 (10th Cir. 2007). Nevertheless, the pattern of retaliatory conduct of which Goldstein complains stemmed from Bryson and Odneal. But Goldstein has presented no evidence linking these two former supervisors to the decision to terminate Goldstein during the 2003 RIF. See Haynes, 456 F.3d at 1228-29 (rejecting asserted causal connection where there was no evidence linking supervisor's decision to place employee under a corrective action plan with employer's later decision to terminate that employee during a RIF); cf. Metzler v. Fed. Home Loan Bank, 464 F.3d 1164, 1173-74 (10th Cir. 2006) (rejecting assertion that there was a pattern of retaliation following protected activity because there was no evidence from which a fact finder could infer a retaliatory motive underlying the allegedly

15

retaliatory acts).  Therefore, the district court did not err in granting Sprint summary judgment on Goldstein's ADEA retaliation claim.

## C.      Disability discrimination

To assert a prima facie disability discrimination claim under the ADA, Goldstein must establish that he "(1) is a disabled person as defined by the ADA; (2) is qualified, with or without accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability."  Justice v. Crown Cork & Seal Co., 527 F.3d 1080, 1086 (10th Cir. 2008) (quotation omitted).

Assuming Goldstein established the first two elements of a prima facie case, he has failed to establish the third.  Goldstein primarily relies on Bryson's and Odneal's conduct during and after Goldstein's short-term disability leave to establish that Sprint terminated him during the 2003 RIF because Sprint regarded him as disabled.  But, again, Goldstein has asserted no evidence linking Bryson or Odneal to Sprint's decision to terminate Goldstein's employment.  Nor is there any evidence that those involved in making the decision to terminate Goldstein regarded him as disabled.  See Rakity v. Dillon Cos., 302 F.3d 1152, 1163 (10th Cir. 2002) (concluding plaintiff failed to establish a disability claim sufficient to survive summary judgment where, even if one of his supervisors did believe plaintiff was not capable of any lifting, that supervisor "was not responsible for making the decision to deny [plaintiff's] promotion request," which was the

16

subject of plaintiff's disability claim).  Therefore, the district court did not err in granting Sprint summary judgment on this claim as well.

## IV.  CONCLUSION

For these reasons, we AFFIRM the district court's decision to grant Sprint summary judgment on all three of Goldstein's claims

ENTERED FOR THE COURT

David M. Ebel
Circuit Judge

17