**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 14, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

       Plaintiff - Appellant,

    v.

PVNF, L.L.C., d/b/a Big Valley Auto
and Chuck Daggett Motors,

       Defendant - Appellee.

No. 06-2011

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D. Ct. No. CIV-03-991 JC/WDS)**

---

Daniel Travis Vail, Attorney (Ronald S. Cooper, General Counsel, James L. Lee, Deputy General Counsel, Lorraine C. Davis, Assistant General Counsel, and Carolyn L. Wheeler, Acting Associate General Counsel, with him on the briefs), United States Equal Employment Opportunity Commission, Washington, DC, appearing for Plaintiff-Appellant.

Linda G. Hemphill, Attorney (Stephanie A. Fuchs, Attorney, with her on the brief), Linda G. Hemphill, P.C., Santa Fe, New Mexico, appearing for Defendant-Appellee.

---

Before **TACHA**, Chief Circuit Judge, **McWILLIAMS**, and **LUCERO**, Circuit Judges.

---

**TACHA**, Chief Circuit Judge.

The Equal Employment Opportunity Commission ("EEOC") seeks reversal of the District Court's entry of judgment as a matter of law in favor of Defendant-Appellee PVNF, LLC d/b/a "Chuck Daggett Motors" ("CDM") on its claims of sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as well as the District Court's award of attorney's fees to CDM. We take jurisdiction under 28 U.S.C. § 1291 and AFFIRM in part, REVERSE in part, and REMAND for a new trial.

## I. BACKGROUND

Marla Segovia was hired in 1996 as a salesperson at Teague-Strebeck Motors, a car dealership. When she was hired, she received a form entitled "No Harassment Policy/Procedure" indicating that Teague-Strebeck Motors prohibited "slurs, jokes and other verbal, graphic, or physical conduct relating to an individual's . . . sex" and instructed those who felt they were being harassed to "make your feelings known to your supervisor immediately." The policy provided that any matter brought to the attention of a supervisor would be "thoroughly investigated, and where appropriate, disciplinary action [would] be taken." Teague-Strebeck Motors sold the dealership in 2000 to Alva Carter and Chuck Daggett. Mr. Carter owned fifty-one percent of the company; Mr. Daggett owned the remaining forty-nine percent. They operated the dealership under the name Chuck Daggett Motors ("CDM") and Mr. Daggett served as the general

manager. The "no harassment" policy continued in full force and effect after the change in ownership.

In January 2000, Mr. Daggett promoted Ms. Segovia from salesperson to Finance Manager. The following year, in June 2001, he promoted her to New Car Sales Manager, a position she held until she resigned in October of that year. At that time, Roger Ennis was the Used Car Sales Manager. Each sales manager had supervisory authority over employees in their respective departments. Ms. Segovia could hire and fire new car salespeople and Mr. Ennis could hire and fire used car salespeople. Each manager could also issue disciplinary notices to any subordinate employee, regardless of which department that employee worked in.

Both managers' pay was commission-based—Ms. Segovia earned commission based on the sale of new cars; Mr. Ennis earned commission based on the sale of used cars. When a prospective customer had a trade-in, the managers had conflicting incentives in assessing the value of the trade-in: Ms. Segovia had an incentive to value the trade-in at a high price to entice the customer to buy a new car, and Mr. Ennis had an incentive to value the trade-in at a low price because he could then sell the trade-in at a greater profit. This dichotomy created tension between Ms. Segovia and Mr. Ennis. Ms. Segovia routinely made more money in commissions than Mr. Ennis. Indeed, in her role as New Car Sales Manager, she was the highest paid employee at Chuck Daggett Motors, aside from Mr. Daggett himself.

Evidence at trial established that Mr. Carter made numerous gender-based remarks to Ms. Segovia and to other female employees.[1]  For example, Mandi Wood, who worked for CDM as a cashier, testified that when she sought a promotion from Mr. Carter he responded that "as . . . a woman . . . [she] should sit behind the computer and that would be more fitting for [her];  and that "as a woman, [she] should sit and count money."  Another employee, Michelle Reid, testified that Mr. Carter commented that he could pay farmhands to work in the office for less than he paid the women.  And Mr. Carter told Ms. Reid, who was pregnant at the time, that "[w]omen take too much time off of work for medical reasons.  They belong at home barefoot and pregnant."  Another time, after Ms. Reid rubbed her belly, Mr. Carter said, "What are our customers going to think with you standing there rubbing your belly?"  Ms. Reid complained about the latter comment to Joanne Richmond, the office manager and systems administrator at CDM, but nothing was done because "people fear[ed] for their job[s]."  Ms. Richmond testified that she heard Mr. Carter mention that women did not belong in the workplace because of their childcare issues; she also testified that Mr. Carter told her he wanted to know when female applicants had children "because of the child care issues."

---

[1]Because this is an appeal from the entry of judgment as a matter of law, we recite and consider the facts in the light most favorable to the nonmoving party—in this case, the EEOC. *See Riske v. King Soopers*, 366 F.3d 1085, 1087 (10th Cir. 2004).

From June to September 2001, Mr. Carter subjected Ms. Segovia to similar sex-based remarks. Soon after she was promoted to New Car Sales Manager, she hired a woman salesperson for the department. Mr. Carter reprimanded her, saying, "I don't want a whole bunch of damn women working here. Men don't like to work with women. Men like to dicker with men." And, "women [bring] their emotional baggage and problems to the dealership." She complained to Mr. Daggett about Mr. Carter's comments and told him that she was thinking of reporting his behavior to the EEOC. Mr. Daggett advised her to "start documenting things" but then said, "[w]e never had this conversation," which Ms. Segovia understood to mean that Mr. Daggett would not support her in reporting Mr. Carter. Following this conversation, Ms. Segovia continued to be subjected to sex-based remarks by Mr. Carter.

During a sales managers' meeting, where Ms. Segovia was the only woman, Mr. Carter told her that he was going to buy her a book on "women in management" and later explained to her that "[t]he difference between men and women is that the women have to take more of a bitch approach." Another time Mr. Carter commented to Ms. Segovia and two other women that "Mexican women's nipples turn black-brown after they had babies," which Ms. Segovia found offensive because her daughter is half-Spanish. Finally, when Ms. Segovia's husband came into the dealership to buy a car, Mr. Carter told him that he "was getting a good deal . . . because he was sleeping with [Ms. Segovia]."

Ms. Segovia was also subjected to arguably sex-based remarks by other CDM employees. In April 2001, during an argument with a male salesperson, he reacted "wildly," stood up and "cleared his desk [of papers] and . . . called [her] a bitch." He threw a plate against the wall, and then left the dealership, quitting. Ms. Segovia felt threatened and scared; she complained about the episode to Mr. Ennis (the salesperson's supervisor) and to Mr. Daggett. Rather than discipline the salesperson, Mr. Ennis went to see him at the request of Mr. Daggett in an effort to get him to return to the dealership because "[he] sold a lot of cars." The salesperson returned to work the following day. He was not disciplined.

On another occasion, Ms. Segovia required a used car salesperson to split the commission on a loan with a new car salesperson because both salespeople played roles in brokering the deal. When the used car salesperson learned of the split commission, he came into Ms. Segovia's office and "violently called [her] a bitch." In response, Ms. Segovia exercised her managerial authority and explained that because of his behavior he would not be receiving any of the commission. Mr. Daggett or Mr. Ennis (it is unclear who) overrode Ms. Segovia's decision, however, and awarded the entire commission to the used car salesperson. Ms. Segovia testified that she was unaware of any time a male manager's decision was overridden by another manager.

In September 2001, Mr. Carter summoned Ms. Segovia into a conversation he was having with Mr. Ennis about the wholesaling of a particular trade-in.

During the conversation, Mr. Ennis commented that he was tired. Ms. Segovia sarcastically suggested that he go take a nap. In response, Mr. Ennis "flipped [her] off" and said "fuck you, bitch." Ms. Segovia responded by saying "I'm done with [this] conversation," and tried to walk away, but Mr. Carter stopped her and said, "[i]f you want to keep your job, you will get your butt back here and finish this conversation." She briefly returned, but then left again. She did not lose her job.

Later that day Ms. Segovia accessed Mr. Daggett's work e-mail account without his permission.[2] While doing so, she noticed that Mr. Ennis had forwarded an e-mail conversation to Mr. Daggett that included a discussion between Mr. Ennis and Jim Smith, one of Ms. Segovia's subordinates in the new-car sales group. In the e-mail exchange Mr. Ennis had asked Mr. Smith why he could not leave work to go buy beer. Mr. Ennis's e-mail questioned Mr. Smith, "Marla [Segovia] got you by the balls?" Mr. Smith responded:

> I wouldn't let that bitch hold my balls if she was the last known woman on earth. If she had balls they would be hanging lower that [sic] that nasty fucking skirt she is wearing. At least she wore panties today. And I know that for a fact and I wasn't looking just walking in the front door . . . I got to thinking about that today, every costomer [sic] that walked in this place today saw her nasty crotch. Gotta go fucking throw-up now.

_____

[2]After the exchange with Mr. Ennis, Ms. Segovia composed and sent an e-mail to Mr. Daggett expressing frustration about the tension between her and Mr. Ennis. She later thought better of it and accessed Mr. Daggett's e-mail account in order to erase the message she had already sent.

(ellipsis in original). Ms. Segovia then composed an e-mail to Mr. Daggett acknowledging that she saw the e-mail from Mr. Ennis and indicated she was offended by the exchange. Ms. Segovia did not go to work the next day. When she next spoke with Mr. Daggett, he said that he verbally reprimanded both Mr. Ennis and Mr. Smith. Mr. Smith wrote Ms. Segovia an e-mail stating that he was told that he had to apologize to her but that he did not understand why she "can't take a joke." Several days later Ms. Segovia tried to complain to Mr. Carter about the e-mail. He indicated that he already knew about it and that she should not let it interfere with her work: "You need to go—just go back to work. That can't stop production."

Approximately one month later, on October 4, 2001, Mr. Daggett delivered to Ms. Segovia an envelope containing an "Employee Warning Notice" and a "New Pay Plan." The warning advised her that she had been late to work too often. It also reported that the salespeople under her supervision had registered complaints about her unavailability, even when she was at the dealership, because she was often out of her office or conducting personal matters. No other sales managers had ever been written-up for tardiness despite evidence that other managers were often late to work. Furthermore, in the three years prior to Ms. Segovia's warning, no other sales managers had been written-up for conducting

personal business at work despite evidence that many of them did.[3] The warning also indicated her work was "unsatisfactory," although Mr. Daggett testified that "when she was there, she did fine" as the New Car Sales Manager.

The new pay plan required Ms. Segovia and Mr. Ennis to start sharing sixty percent of their combined commissions. More specifically, sixty percent of the gross obtained from new-car sales would be committed to a pool of funds; similarly, sixty percent of the gross obtained from used-car sales would be committed to the pool. Mr. Ennis and Ms. Segovia would each receive four percent of the pool, as well as four percent of the remaining forty percent of sales' gross not committed to the pool. Prior to the new plan, Ms. Segovia and Mr. Ennis did not share commissions on the combined sales of new and used cars. Ms. Segovia understood the new arrangement to be a pay cut for her and a pay raise for Mr. Ennis because she routinely made more money than Mr. Ennis and she would now be sharing her commissions with him. Mr. Daggett testified that the new pay plan was put into effect because (1) CDM learned that it was paying its salespeople fifteen to twenty percent over the market rate and the pay plan was an effort to reduce the managers' salaries, and (2) the pooling of funds was intended to eliminate the conflict between Ms. Segovia and Mr. Ennis over trade-

---

[3]There was evidence that one male manager left the premises everyday to pick his children up from school and take them to daycare. Other male managers would leave work to attend sporting events, and some employees, including Mr. Ennis and Mr. Daggett, would sometimes drink beer behind the dealership during business hours.

in values.  The New Car Sales Manager who ultimately replaced Ms. Segovia was subject to the new pay plan.

Finding the warning and the new pay plan unacceptable, Ms. Segovia threw the documents on Mr. Daggett's desk and told him that she felt they were trying to drive her out of the dealership.  She resigned as New Car Sales Manager that day because she felt she could not "be in [that] target position anymore." Out of concern for her family's financial stability, however, she later inquired as to whether there was another position she could take at the dealership.  The dealership did not offer her an alternative position.

Ms. Segovia filed a charge of discrimination with the EEOC on May 30, 2002.  The EEOC filed suit against CDM on her behalf, *see* 42 U.S.C. § 2000e-5(f)(1), alleging retaliation and discrimination on the basis of sex under Title VII of the Civil Rights Act of 1964,  42 U.S.C. § 2000e et seq.  The EEOC also filed suit on behalf of Ms. Richmond, alleging similar claims.  Following discovery, the EEOC voluntarily dismissed the sexual harassment claims respecting Ms. Richmond.  CDM then moved for summary judgment on the EEOC's remaining claims.  The District Court granted the motion with respect to the remaining claims brought on behalf of Ms. Richmond,[4] but denied the motion with respect to the claims brought on behalf of Ms. Segovia.

The EEOC proceeded to trial on allegations that Ms. Segovia was subject to

---

[4]The EEOC does not appeal this ruling.

a hostile work environment on the basis of sex, that she was subjected to other adverse employment actions on the basis of sex, and that she was constructively discharged and retaliated against for engaging in protected activity. Following the EEOC's presentation of evidence, the District Court entered judgment as a matter of law in favor of CDM on all claims. It then awarded CDM attorney's fees, concluding that the EEOC's case was frivolous. This appeal followed.

## II. DISCUSSION

A.    Title VII

We review de novo a district court's grant of judgment as a matter of law, applying the same standards as the district court. *EEOC. v. Heartway Corp.*, 466 F.3d 1156, 1160 (10th Cir. 2006). In reviewing the record, we draw all reasonable inferences in favor of the nonmoving party without making credibility determinations or weighing the evidence. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." (quotation omitted)). That is, we disregard all evidence favorable to the moving party that the jury is not required to believe. *Id.* at 151. A party is entitled to judgment as a matter of law "only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 812 (10th Cir. 2000) (quotation omitted); Fed. R. Civ. P. 50(a) (a

-11-

court may enter judgment as a matter of law when "a party has been fully heard on an issue" and there is no "legally sufficient evidentiary basis to find for the party on that issue").

1.    Discrimination on the basis of sex

The EEOC appeals from the District Court's entry of judgment as a matter of law for CDM on three theories of disparate treatment under Title VII: (1) Ms. Segovia was subjected to a hostile work environment on the basis of sex; (2) CDM issued the employee warning notice and implemented the new pay plan as a result of discrimination on the basis of sex; and (3) CDM's discriminatory conduct toward Ms. Segovia amounted to constructive discharge. We conclude that the EEOC has presented a jury question with respect to whether Ms. Segovia was subjected to a sexually hostile work environment. We also conclude that based on the EEOC's evidence at trial, no reasonable jury could conclude that Ms. Segovia was reprimanded, placed on a new pay plan, or constructively discharged on the basis of her sex.

a.    *Hostile work environment*

Pursuant to Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). If a plaintiff proves that "discrimination based on sex has created a hostile or

abusive work environment," she has established a violation of Title VII. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). To constitute actionable sexual harassment, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007) (quotation omitted), and that the victim was targeted "because of her gender," *Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005) (emphasis removed). Although a few isolated incidents of gender animus does not establish a pervasively hostile work environment, *see Herrera*, 474 F.3d at 680, the pervasiveness of the hostility "is quintessentially a question of fact" and thus particularly unsuited for resolution on a motion for judgment as a matter of law, *see O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999) (quotation omitted) (noting that summary judgment should seldom be used in employment discrimination cases).

We conclude that, based on the conduct described above, a reasonable jury could find that Ms. Segovia was subjected to a severe or pervasively hostile work environment because of her sex. CDM characterizes many of the sex-based epithets as either "stray remarks" or "innocuous" such that no reasonable jury could conclude they created a hostile work environment. For example, it suggests that while Mr. Carter's comment about a woman's nipples is "odd," it is not

-13-

"severe or humiliating."  It also maintains that a reasonable person would not find Mr. Carter's comments about women in management and his comment about Ms. Segovia's intimate relationship with her husband "humiliating."

In addition, although CDM admits that the e-mail concerning Ms. Segovia was "vulgar and offensive," it reasons that "it is far from clear" that the comments resulted from gender bias and accuses the EEOC of "sensational[izing]" it.  CDM also contends that the e-mail, even assuming it is gender-based, is not evidence of discrimination or harassment because Ms. Segovia was never intended to see it.  With this last proposition, we heartily disagree.  Such a statement is akin to asserting that a person who overhears her coworkers using sexually derogatory terms to describe her cannot be subjected to a hostile work environment merely because the coworkers did not intend her to hear them.  This is not the law of this Circuit.  We have never held, nor would we, that to be subjected to a hostile work environment the discriminatory conduct must be both directed at the victim and intended to be received by the victim.  *Cf. Harsco Corp. v. Renner*, 475 F.3d 1179, 1183, 1186–87 (10th Cir. 2007) (including as part of the totality of the circumstances in a hostile work environment claim the fact that the plaintiff overheard co-workers making sexually derogatory remarks about her); *Herrera*, 474 F.3d at 681 (including employer's reference to victim as "fucking Mexican" outside victim's presence, but relayed to him by a third party, as part of the hostile work environment

-14-

calculus). Thus, the fact that Ms. Segovia was not the intended recipient of the e-mail is of no consequence in our review of the totality of the circumstances.

CDM also maintains with respect to the repeated use of the word "bitch"to describe Ms. Segovia that it was "used to vilify overbearing and seemingly unfair behavior by Segovia and was not intended in a sexual context." It also notes that even Ms. Segovia admitted to using the word on occasion in a non-sexual context. But we have characterized the word as a "sexual epithet[]" that courts have described as "intensely degrading," *Windsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1000 (10th Cir. 1996) (quotation omitted), and "if it reasonably could be inferred that [seemingly gender-neutral conduct] was [actually] related to gender or arose out of a context in which admittedly sex and gender-related conduct occurred, then it is for the fact finder to decide whether such an inference should be drawn." *O'Shea*, 185 F.3d at 1097; *see also Windsor*, 79 F.3d at 1000 ("It is beyond dispute that evidence that a woman was subjected to a steady stream of vulgar and offensive epithets because of her gender would be sufficient to establish a claim under Title VII . . . ." (quotation omitted)). Here, Mr. Carter frequently made indisputably gender-related remarks, and tolerated the use of the word "bitch" to describe Ms. Segovia. Under these circumstances, we think a jury should decide whether these comments were made because of gender animus.

With respect to the pervasiveness of the conduct, the bulk of it occurred during a relatively short period of time—the four month period beginning with

Ms. Segovia's promotion to New Car Sales Manager. The majority owner of the dealership repeatedly subjected her (and others) to comments about a woman's "appropriate" role in the workplace; her co-workers used sexual epithets to describe her (on one such occasion she felt physically threatened when a coworker threw a plate against a wall); and she intercepted a vulgar e-mail describing her genitalia that was written by one of her subordinates, addressed to another manager, and forwarded on to her supervisor. Moreover, her supervisor knew about all this conduct and either chose to ignore it altogether or respond in only the most minimal of ways (e.g., forcing a half-hearted apology). *See Harsco Corp.*, 475 F.3d at 1188 ("An employer will not be liable under Title VII if the employer was not on actual or constructive notice of the alleged harassment. Actual knowledge is usually demonstrable where the plaintiff has reported harassment to management-level employees." (internal citation omitted)).

By parsing out the various instances of harassment and characterizing them as gender-neutral, or not pervasive, CDM seeks to eschew the proper "totality of the circumstances" test, which is the "touchstone" of our analysis of hostile work environment claims. *See Harsco Corp.*, 475 F.3d at 1186–87; *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1262 (10th Cir. 1998) (observing that "the very term 'environment' indicates that allegedly discriminatory incidents should not be examined in isolation" and the fact-finder in a sexual harassment case should not "examine each alleged incident of harassment in a vacuum[ ]

-16-

[because w]hat may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other related incidents." (quotation omitted)).  The facts, when taken together and in the light most favorable to the EEOC, could reasonably support a finding that the work environment was charged with gender-bias and sexual animus.  *See Harsco Corp.*, 475 F.3d at 1187 (factors to consider in evaluating whether the environment is hostile or abusive include: "the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.").  It may be that a jury would agree with CDM that Ms. Segovia was not subjected to a severe or pervasively hostile environment based on her sex, but that is not for this Court to decide.

### b.  Disparate treatment

Under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973), the plaintiff bears the initial burden to establish a prima facie case of sex discrimination, which varies depending on the type of adverse action the employee alleges was discriminatory.  *See Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) ("[T]he articulation of a plaintiff's prima facie case may well vary, depending on the context of the claim and the nature of the adverse employment action alleged.")  In this context, a prima facie case of discrimination must consist of evidence that (1) the victim belongs to a

protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination. *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 (10th Cir. 2005). Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1311 (10th Cir. 2006). If the employer does so, the burden shifts back to the plaintiff to show that there is a genuine issue of material fact as to whether the employer's proffered reasons are pretextual. *Id.*[5]

### The Employee Warning Notice

The EEOC contends that Ms. Segovia was disciplined more harshly than others because of her sex. Notably, CDM concedes that the warning notice it issued to Ms. Segovia was an adverse employment action despite this Circuit's rule that a written warning is an adverse employment action "*only* if it effects a significant change in the plaintiff's employment status," *Haynes v. Level 3*

---

[5]There exists some tension in our case law regarding what a plaintiff must establish as part of his or her prima facie case of discrimination. Some cases treat circumstances suggestive of discrimination as an element of a prima facie case; other cases treat the surrounding circumstances as part of the analytically subsequent inquiry into the employer's stated reason for the challenged action and the plaintiff's opposing demonstration of pretext. *Sorbo*, 432 F.3d at 1173 & n.5 (listing cases). Regardless of whether we analyze the plaintiff's evidence "in reference to the prima facie case or the business justification versus pretext inquiry, . . . if the court correctly concludes that the evidence of discrimination/pretext fails as a matter of law, summary judgment for the defendant is the proper result." *Id.* at 1173.

-18-

*Commc'ns., LLC*, 456 F.3d 1215, 1224 (10th Cir. 2006) (emphasis added), by, for example, "affect[ing] the likelihood that the plaintiff will be terminated, undermin[ing] the plaintiff's current position, or affect[ing] the plaintiff's future employment opportunities," *Medina v. Income Support Div.*, 413 F.3d 1131, 1137 (10th Cir. 2005). Although none of these factors appear to be present here, because CDM concedes this issue, we will not address it.

The EEOC has established a prima facie case, then, if it can show that CDM issued Ms. Segovia a warning notice under circumstances that give rise to an inference of discrimination.[6] One method by which a plaintiff can meet this burden, and the method by which the EEOC proceeds, is to show that the employer treated similarly situated employees more favorably. *Sorbo*, 432 F.3d at 1173.

Individuals are considered "similarly-situated" when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of "comparable seriousness." *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006). The EEOC contends that Mr. Ennis is similarly situated and that he was never written up for any of his workplace infractions, including frequent tardiness, calling Ms. Segovia a "bitch," and drinking beer behind the dealership with other

[6]Ms. Segovia is a member of a protected class because she is a woman. 42 U.S.C. § 2000e-2(a)(1) (prohibiting discrimination against any individual with respect to sex).

employees during business hours. But the EEOC has failed to establish that Ms. Segovia and Mr. Ennis engaged in conduct of comparable seriousness and were disciplined in a way that gives rise to an inference of discrimination. The tenor of the warning notice Ms. Segovia received was that her conduct rendered her unavailable to help her sales personnel complete deals. In other words, Ms. Segovia was disciplined for productivity-related concerns. She was chronically late to work; she often made personal calls on her company-issued cell phone during work hours; and she often could not be found in her office when her staff needed her. As a result, another employee was required to fill-in for her, causing that employee to fall behind in his own work.

The conduct for which Ms. Segovia argues Mr. Ennis should have been punished, with the exception of his tardiness, is not productivity-related. Although there was evidence that Mr. Ennis was often late to work, there is no evidence that his tardiness prevented him or others from completing their duties. Furthermore, with respect to evidence that Mr. Ennis drank beer behind the dealership during business hours, the uncontradicted testimony was that it was an occasional event that only took place late in the evening, right before closing. Again, there is nothing to suggest that such conduct interfered with his or other employees' duties. Mr. Ennis's conduct was not sufficiently similar to Ms. Segovia's to permit an inference of discrimination on the basis of their disparate treatment. *See McGowan*, 472 F.3d at 745 ("[E]ven employees who are similarly

situated must have been disciplined for conduct of 'comparable seriousness' in order for their disparate treatment to be relevant." (quoting *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

Even if we were to conclude, however, that the EEOC met its burden to establish a prima facie case of discrimination, it has failed to introduce evidence that demonstrates CDM's proferred reason for issuing the written warning—Ms. Segovia's unavailability in the workplace, which was causing problems for her subordinates—was pretextual. The EEOC has not provided evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in CDM's proffered reason "that a reasonable factfinder could rationally find [it] unworthy of credence. *Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005) (quotation omitted) (upholding summary judgment on Title VII claim where plaintiff failed to provide evidence supporting claims of pretext).

The EEOC suggests that evidence that Mr. Ennis and other employees were not written up for conduct such as using the word "bitch," sending derogatory e-mails, leaving work to take children from school to daycare, etcetera, rebuts any legitimate, non-discriminatory business reason CDM may proffer for the difference in treatment. First, as noted above, Mr. Ennis is not similarly situated to Ms. Segovia under this Circuit's precedent. *See Sorbo*, 432 F.3d at 1173–74 (noting that evidence that a similarly situated employee was treated differently may aid the plaintiff in satisfying its burden to establish a prima facie case of

-21-

discrimination, or, in other circumstances, may raise an inference of pretext in the third stage of the *McDonnell Douglas* burden-shifting method of proof). Furthermore, there is substantial evidence in the record that Ms. Segovia also engaged in the same type of non-productivity-related misconduct and was not written-up. For example, she was not disciplined for using profanity in the workplace although she sometimes did so. She was not disciplined for logging onto Mr. Daggett's password-protected computer and using his e-mail without his permission. Nor was she disciplined when she slid magazines to a salesperson under the bathroom door, in front of customers, telling him to "[h]urry up."

Finally, despite Ms. Segovia's testimony that she felt the warning was "unfair" and that the basis for the warning was not "accurate," she does not deny the particulars of the allegations contained in the employee warning notice. She admitted that she was often late to work. She admitted that she made personal calls during work hours but insisted that they were not excessive. This testimony was rebutted by her cell phone records, however, which revealed that she logged nearly 1500 minutes of talk time during the relevant period. She also admitted that she "wasn't glued to [her] chair in [her] office" but testified that she was not unavailable—she was just elsewhere at the dealership, checking on inventory, for example. She was unable to dispute that her staff frequently complained to Mr. Daggett about her conduct, although she testified that only one of them ever complained to her about it.

Again, although there was evidence that other employees were sometimes late to work, there is no evidence that their conduct prevented them or others from completing their duties. Similarly, though Ms. Segovia testified that one manager left the dealership almost everyday to take his children from school to daycare, he was only gone from approximately 3:00 to 3:30 p.m., and nothing suggests that he was needed by his coworkers during that period or that his coworkers did not know how to locate him. Finally, with respect to evidence that various employees drank beer behind the dealership during business hours, the uncontradicted testimony was that it was an occasional event that only took place late in the evening, right before closing. Again, there is nothing to suggest that such conduct interfered with the employees' duties. As such, the EEOC fails to establish a genuine issue of fact as to pretext on this basis.

The New Pay Plan

The EEOC next contends that the new pay plan was an adverse employment action that CDM implemented because of Ms. Segovia's sex. Again, CDM concedes that Ms. Segovia suffered an adverse employment action in that her salary was reduced. It contends, however, that the EEOC failed to establish that a similarly situated male did not also have his salary reduced. It maintains that Mr. Ennis was treated exactly the same as Ms. Segovia—that is, he was also placed on the new pay plan.

The EEOC presented no evidence as to the actual effect the new pay plan

would have on Mr. Ennis's and Ms. Segovia's salaries. Because Ms. Segovia routinely made more than Mr. Ennis before the pooling of commissions, it would appear that after implementation of the plan's pooling arrangement Ms. Segovia would earn less than before, while Mr. Ennis would have a corresponding increase in salary. If this were the case we would likely conclude that the EEOC satisfied the third prong of the prima facie case. But the new pay plan also contains a bonus structure under which each manager is rewarded based on the absolute number of cars each sells. In this regard, Ms. Segovia's compensation is more favorable than Mr. Ennis's—she would receive bonuses after the sale of 55, 60, and 70 new cars while Mr. Ennis's bonuses would not kick in until after the sale of 60, 65, and 75 used cars. The EEOC points to no evidence related to this bonus structure, including whether it differed from the prior pay plan. In other words, there is no evidence that Mr. Ennis would be making more money than he did before (or that his salary was reduced by less than Ms. Segovia's) other than pure conjecture.[7] And while the EEOC is entitled to all reasonable inferences in its favor, these inferences "must be more than speculation and conjecture." *Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 521 (10th Cir. 1987).

Furthermore, the uncontradicted evidence revealed that CDM was a company in financial trouble and the new pay plan was an effort to reduce the

---

[7]In fact, Mr. Ennis (the only person who testified on this point) said that after implementation of the new pay plan, he made less money, which is one reason he quit CDM to take a job elsewhere.

managers' salaries to correspond to the market rate. Finally, a male replaced Ms. Segovia as the New Car Sales Manager when she resigned and he was subject to the new pay plan, which further undermines the EEOC's contention that the pay plan was intentionally sexually discriminatory.

2.    Retaliation

Title VII makes it unlawful to retaliate against an employee for opposing practices made unlawful by the statute. 42 U.S.C. § 2000e-3(a). A prima facie case of retaliation requires a plaintiff to show (1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse—that is, that the action might "dissuade[] a reasonable worker from making or supporting a charge of discrimination," *Burlington N. & Santa Fe Ry. Co. v. White*, — U.S. — , 126 S.Ct. 2405, 2414–15 (2006) (quotation omitted); and (3) that a causal connection exists between the protected activity and the materially adverse action. *See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006). As noted, CDM concedes that the disciplinary notice and the new pay plan were both materially adverse employment actions.[8] It maintains, however, that Ms. Segovia never

[8]We note that it is not clear that the warning notice is a materially adverse action in the context of a retaliation claim. Although we recently held that "[a] written warning may be an adverse employment action only if it effects a significant change in the plaintiff's employment status," *Haynes*, 456 F.3d at 1224 (emphasis omitted), we have not had occasion to revisit this holding in light of the Supreme Court's decision in *White*. There, the Court clarified that the

(continued...)

-25-

engaged in any protected conduct nor is there a causal link between any such conduct and the challenged actions. We disagree.

First, Ms. Segovia unquestionably engaged in protected activity when she complained to Mr. Daggett about Mr. Carter's comment that he did not want her to hire women salespeople. She told Mr. Daggett she was thinking of reporting Mr. Carter's behavior to the EEOC. CDM makes much of the fact that although she threatened to do so, Ms. Segovia did not actually file a formal charge of discrimination with the EEOC until after she resigned. But the prohibition against retaliation protects conduct short of filing a formal charge—it prohibits discrimination against an individual simply for "oppos[ing] any practice made an unlawful employment practice" by Title VII. *See* 42 U.S.C. § 2000e-3(a). We have noted that "[p]rotected opposition can range from filing formal charges to voicing informal complaints to superiors." *See Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004). Ms. Segovia's complaint falls comfortably within this standard.

Ms. Segovia also complained to Mr. Daggett about the vulgar e-mail he received from Mr. Ennis, which also amounts to protected activity. Although

<hr>

[8](...continued)
challenged action in a retaliation claim need not necessarily result in an adverse effect on the terms or conditions of employment, so long as it would dissuade a reasonable employee from engaging in protected activity. *White*, 126 S. Ct. at 2410–15. But because CDM concedes the warning notice here was materially adverse, we need not decide the issue.

-26-

CDM contends that Mr. Daggett "never understood that Segovia was complaining about discrimination in the workplace"—presumably because she did not explicitly invoke her rights under by Title VII—the record reveals the opposite. Mr. Daggett testified that he knew the e-mail contained "offensive sexual language," "was not appropriate for the workplace," that it was a violation of CDM's "no harassment policy," and that Ms. Segovia was upset by it.[9]

Second, the EEOC has presented sufficient evidence of a causal connection between Ms. Segovia's protected activity and her receipt of a warning notice and the implementation of the new pay plan. A causal connection can be inferred from the fact that the challenged action closely follows the employee's protected activity. *See Argo*, 452 F.3d at 1202. Here, the challenged actions were within a month of Ms. Segovia's last instance of protected activity. We have previously held that such temporal proximity, alone, is sufficient to allow an inference of the existence of a causal connection between the two events. *See id*. (indicating twenty-four days between protected activity and adverse action gives rise to a rebuttable inference of a causal connection); *Anderson v. Coors Brewing Co.*, 181

_____

[9]The EEOC also suggests that Ms. Segovia engaged in protected activity when she walked away from the conversation that Mr. Carter had summoned her into with Mr. Ennis: "I felt like me walking away from that was a complaint to Mr. Carter that I didn't want . . . to be talked to like that, and I didn't want to be treated like that." AA 538. Although we have serious reservations that Ms. Segovia's conduct in walking away could be construed as protected activity, we need not decide that issue here since we conclude that she engaged in other activity protected by the Act.

F.3d 1171, 1179 (10th Cir. 1999) (indicating that six weeks between protected activity and adverse action gives rise to an inference of causation).

Having satisfied its burden to establish a prima facie case of retaliation, it was incumbent upon CDM to proffer a legitimate, nondiscriminatory reason for the adverse action. *See Argo*, 452 F.3d at 1202; *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1273–74 (10th Cir. 2005) (applying the *McDonnell Douglas* burden-shifting analysis in an age discrimination case to review the district court's denial of judgment as a matter of law at the close of the trial). As before, CDM contends that Ms. Segovia's unavailability warranted the warning notice and that CDM's effort to reduce salaries and to ease the tension between Ms. Segovia and Mr. Ennis over the value of trade-ins warranted the implementation of the new pay plan. Both of these are legitimate, nondiscriminatory reasons for the challenged actions, and the burden therefore shifts back to the EEOC to demonstrate that the proffered reasons for the actions are pretextual. *See Argo*, 452 F.3d at 1203.

To show pretext, the EEOC must produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (quotation omitted). As with its discrimination claim, the EEOC's evidence of pretext

-28-

related to the warning notice primarily relies on its contention that similarly situated individuals who did not engage in protected activity were treated differently. *See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1175 (10th Cir. 2006) ("[A] plaintiff may show pretext by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." (quotation omitted)). As the discussion above demonstrates, however, it did not establish that a similarly situated individual was treated differently.

With respect to the new pay plan, the EEOC contends that the pooling arrangement could not have its desired effect of reducing the tension between Ms. Segovia and Mr. Ennis over the pricing of trade-ins because the conflict would have persisted with respect to the forty percent of the gross sales not committed to the pool. The fact that other ways to reduce the conflict may have existed or that the conflict was not totally eliminated by the new pay structure, however, does not indicate that the plan was a "subterfuge for discrimination," *see Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006), and we must bear in mind that neither this Court, nor a jury, may act as a "super personnel department, second guessing employers' honestly held (even if erroneous) business judgments," *id.* (quotation omitted); *see also Argo*, 452 F.3d at 1203. There is no doubt that the pooling arrangement would reduce the pricing tension, at least with respect to sixty percent of sales, and thus the EEOC has failed to show this

proffered reason is pretextual.

### 3. Constructive Discharge

"Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Sandoval v. City of Boulder*, 388 F.3d 1312, 1325 (10th Cir. 2004) (quotation omitted). In evaluating whether the employee's working conditions would cause such a feeling in a reasonable person, "we apply an objective test under which neither the employee's subjective views of the situation, nor her employer's subjective intent . . . are relevant." *Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1270 (10th Cir. 2004). The plaintiff's burden in a constructive discharge case is substantial and showing that the employer's conduct meets the definition of "tangible employment action" or "adverse employment action" is "not necessarily sufficient to establish a constructive discharge because a constructive discharge requires a showing that the working conditions imposed by the employer are not only tangible or adverse, but intolerable." *Id.* at 1270–71; *see also Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004) ("A hostile-environment constructive discharge claim entails something more [than conduct that amounts to actionable harassment]: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign."); *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221

(10th Cir. 2002) (stating that "[t]he bar is quite high in such cases"). Importantly, in constructive discharge cases "[t]he question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions." *Tran*, 355 F.3d at 1270.

In support of its constructive discharge claim, the EEOC refers back to the aforementioned evidence of discriminatory harassment. It adds to the calculus Mr. Daggett's delivery to Ms. Segovia of the warning notice and new pay plan. After reviewing the record in light of the standard for constructive discharge claims discussed above, we conclude that the EEOC has failed to present sufficient evidence that a reasonable person in Ms. Segovia's position would have felt compelled to resign.[10] Adding the implementation of the new pay plan to the equation does not change this result. A constructive discharge requires a showing that the employer's actions are not merely adverse, but intolerable, *see id.* at

---

[10]We note that the District Court entered judgment as a matter of law in favor of CDM on the EEOC's constructive discharge claim, reasoning that "Ms. Segovia's admitted desire to return to work for [CDM] eviscerates her contention that the workplace was intolerable." In this Circuit, however, the test for constructive discharge is an objective one. This standard cuts both ways—just as an employee's subjective feelings that her working conditions were intolerable is not controlling in the constructive discharge analysis, neither is an employee's desire to continue working despite conditions so intolerable any reasonable employee would have long since quit. *See Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005) ("When examining a constructive discharge claim, we disregard both the employee's subjective view of the workplace environment and the employer's subjective intentions regarding the employee.").

1271, and Ms. Segovia quit before she knew precisely the effect the new pay plan would have on her salary, *see Garrett*, 305 F.3d at 1222 (the plaintiff failed to establish constructive discharge in part because the plaintiff resigned before he had complete details as to the position into which the employer was in the process of transferring him). Furthermore, the EEOC produced no evidence at trial indicating the precise effect the new pay plan would have on the managers' salaries. As such, the EEOC has failed to show that Ms. Segovia's working conditions were intolerable and that she "had no other choice but to quit," *see id.* at 1221. We therefore affirm the District Court's entry of judgment as a matter of law on this issue.

B.    Attorney's Fees

After entering judgment in favor of CDM, CDM moved for attorney's fees pursuant to 42 U.S.C. § 2000e-5(k), contending that the EEOC's claims were frivolous, unreasonable, or without foundation. The District Court concluded that it was appropriate to grant certain fees to CDM. With respect to the EEOC's claims brought on behalf of Ms. Segovia, the District Court reasoned that the "EEOC is charged with evaluating claims prior to filing suit and throughout the litigation process and the evidence marshaled in this case does not support the claims asserted." Thus, although the court denied CDM's motion for summary judgment, finding genuine issues of fact for trial, it nevertheless found an award of attorney's fees appropriate. It also awarded CDM attorney's fees related to

claims brought on behalf of Ms. Richmond. Though it denied those fees associated with the hostile work environment claim the EEOC voluntarily dismissed at the close of discovery, it granted CDM's request for fees associated with those claims that the EEOC unsuccessfully defended in summary judgment proceedings.

The relevant statute provides, in pertinent part:

> In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

42 U.S.C. § 2000e-5(k). We review the district court's award of attorney's fees under this statute for an abuse of discretion. *Carter v. Sedgwick County*, 929 F.2d 1501, 1056 (10th Cir. 1991). "A Title VII defendant is not entitled to an award of fees unless the court finds that the plaintiff's 'claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so.'" *Simons v. Sw. Petro-Chem, Inc.*, 28 F.3d 1029, 1033 (10th Cir. 1994) (quoting *Christianburg Garment Co. v. EEOC.*, 434 U.S. 412, 422 (1978)).

1.    Ms. Segovia's claims

Because of our disposition of this case on the merits of Ms. Segovia's sexual harassment claim, we conclude that the District Court abused its discretion in awarding CDM attorney's fees. *See EEOC v. St. Louis-San Francisco Ry. Co.*,

743 F.2d 739, 744 (10th Cir. 1984) (reversing judgment in favor of the defendant and, in light of that disposition, concluding the district court abused its discretion in awarding attorney's fees to the defendant); *see also Sullivan v. Sch. Bd. of Pinellas County*, 773 F.2d 1182, 1189 (11th Cir. 1985) ("In cases where the plaintiffs introduced evidence sufficient to support their claims, findings of frivolity typically do not stand."). Furthermore, although we conclude that the District Court appropriately entered judgment in favor of CDM on the remaining claims related to Ms. Segovia, the facts as presented do not warrant a determination that the case was meritless, which is "to be understood as meaning groundless or without foundation." *Christianburg Garment Co.*, 434 U.S. at 421. As the Supreme Court has warned, the "district court [must] resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." *Id.* at 421–22.

2.    Ms. Richmond's claims

The EEOC also appeals the award of attorney's fees related to Ms. Richmond's disparate treatment claim. Aside from restating the relevant legal standard, the EEOC's brief on appeal does not provide this Court a basis on which to conclude that the District Court abused its discretion in awarding CDM these fees. The only part of the record addressing Ms. Richmond's disparate treatment claim is the EEOC's response to CDM's motion for summary judgment, which

-34-

does not include relevant material from which this Court may adequately review the District Court's decision—e.g., supporting affidavits, interrogatories, or depositions. In other words, the EEOC did not produce a record that would permit this Court to conclude that its claim was not frivolous. Accordingly, we affirm the District Court's award of attorney's fees on this issue.

## III. CONCLUSION

Because a reasonable jury could find that Ms. Segovia was subjected to a hostile work environment on the basis of sex, we reverse the District Court's entry of judgment as a matter of law on that issue. Because the EEOC failed to present sufficient evidence from which a reasonable jury could conclude that CDM constructively discharged Ms. Segovia, issued her an employee warning notice, or placed her on a new pay plan because of her sex or because she engaged in activity protected by Title VII, we affirm the District Court's entry of judgment as a matter of law on those issues. Finally, because the EEOC's claims related to Ms. Segovia are clearly not frivolous, the District Court abused its discretion in awarding CDM attorney's fees. We reverse and remand for a new trial.