FILED
United States Court of Appeals
Tenth Circuit

October 19, 2022

Christopher M. Wolpert
Clerk of Court

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

LARISA THOMPSON,

    Plaintiff - Appellant,

v.

LITTLE AMERICA HOTEL CO.,

    Defendant - Appellee.

No. 22-4006
(D.C. No. 2:20-CV-00466-DBB)
(D. Utah)

_____

## ORDER AND JUDGMENT[*]
_____

Before **TYMKOVICH**, **PHILLIPS,** and **McHUGH**, Circuit Judges.
_____

Little America Hotel Company ("Little America") fired Larisa Thompson, a gift store supervisor in the Retail Department, after thirteen years of employment. From the start of her employment, Ms. Thompson struggled with following rules and getting along with her coworkers. Two years prior to her termination, Little America promoted her coworker Kari Lund to be Ms. Thompson's direct supervisor. Ms. Lund "wrote up" Ms. Thompson frequently and brought Ms. Thompson's performance issues to the attention of upper management, causing Little America's general manager, Mark Mundel, to become involved. Mr. Mundel started coaching

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

Ms. Thompson directly for over a year, meeting with her on several occasions. After Ms. Thompson disobeyed Mr. Mundel's coaching instructions multiple times, Mr. Mundel made the decision to terminate her employment.

Ms. Thompson is from Russia and claimed Little America terminated her employment on the basis of her national origin in violation of 42 U.S.C. § 2000e-2(a)(1). She sued Little America, alleging Ms. Lund harbored animus against her due to her Russian identity leading Ms. Lund to create a paper trail of violations which eventually led to Mr. Mundel's decision to terminate her employment. Little America moved for summary judgment, arguing Ms. Thompson had not met her burden to establish a prima facie case, or alternatively, her burden to demonstrate Little America's legitimate reasons for firing her were pretextual because the only people she alleged showed anti-Russian animus, Ms. Lund and a coworker, Peggy Kounalis, were not involved with Mr. Mundel's termination decision.

The district court granted Little America's motion for summary judgment, holding no reasonable juror could conclude Little America's legitimate, stated reasons for terminating Ms. Thompson's employment were pretextual. Ms. Thompson appeals the district court's grant of summary judgment, arguing this court should attribute Mr. Mundel's decision to Ms. Lund's alleged anti-Russian bias based on the cat's paw theory of liability. Because Ms. Thompson has not sustained her burden to demonstrate Ms. Lund's actions were the cause of Mr. Mundel's decision, and has not alleged he was acting based on his own discriminatory animus, we affirm the district court.

2

## I.     BACKGROUND

Because this is an appeal from a grant of summary judgment, we "recite the facts in the light most favorable to the non-moving part[y]—the Plaintiff[]—and [] resolv[e] all factual disputes and reasonable inferences in [her] favor." *Gutierrez v. Cobos*, 841 F.3d 895, 898 n.1 (10th Cir. 2016) (internal quotation marks omitted). Ms. Thompson began working at Little America in 2000 as a banquet server. She then transferred to work in the gift shop where she was supervised by Diane Friar. Ms. Thompson considered her working relationship with Ms. Friar to be "wonderful," describing Ms. Friar as "very tough, but very fair." App. Vol. II at 301. She did not at any point think Ms. Friar harbored any negative feelings based on her national origin.

Ms. Friar supervised Ms. Thompson from 2002 through 2016. Ms. Friar generally rated Ms. Thompson's work as good in performance reviews, on a scale with the options of fair, good, or outstanding. Two themes emerged in her annual reviews—Ms. Thompson excelled in developing client relationships and increasing sales but had recurring issues with following rules, interacting with coworkers, and communication generally. In Ms. Friar's 2010 work progress review of Ms. Thompson, she noted Ms. Thompson "need[ed] to be aware of other people's opinions" and to resolve a conflict with a coworker because "[t]he friction between them is upsetting everyone." App. Vol. I at 168. Later that year, Ms. Friar wrote an email to the Human Resources Department reporting Ms. Thompson had clocked in to work and then left to find parking, describing this as unacceptable behavior for a

supervisor. In 2011, Ms. Friar noted Ms. Thompson was constantly on the phone; speaking in Russian without it having been initiated by a guest in violation of store policy; and that "she believes rules are ok to break." *Id.* at 172–73. In 2012, Ms. Friar applauded Ms. Thompson for increasing her sales, but noted she needed to improve her performance by having "[h]armony in her relationships with other employees." *Id.* at 175. That same year, Ms. Friar reprimanded Ms. Thompson for hanging up the phone on Ms. Friar when she denied Ms. Thompson's request for time off for a friend's funeral. In her 2013 performance review, Ms. Friar noted Ms. Thompson "appears to be snob[b]ish at times" and could work on having "[a] more friendly demeanor" and not being "pushy with her customers." *Id.* at 181. In 2014, Ms. Friar wrote Ms. Thompson was still succeeding with sales and developing customer relationships but struggled to accept criticism. When discussing these performance issues with Ms. Thompson over the years, Ms. Friar told Ms. Thompson she had to include areas for improvement as part of the review process.

In 2016, Ms. Friar retired, and Little America promoted Ms. Lund to be the new gift store manager. Prior to Ms. Lund's promotion, Ms. Thompson and Ms. Lund had been peers, both working as gift store supervisors. Since before Ms. Lund's promotion, Ms. Thompson had a feeling Ms. Lund did not like her because she was Russian. Ms. Thompson described it as a "feeling" or "impression" based on "[s]ome little details I don't remember even." App. Vol. II at 316. While cutting a box together to open an order, Ms. Lund allegedly told Ms. Thompson "I will rip you off" or "I will . . . tear you to pieces or I will rip you off." *Id.* at 322–23, 353.

4

Ms. Thompson claimed Ms. Lund told her not to speak Russian in the store but allowed her Spanish-speaking coworker to talk to the cleaning crew in Spanish without criticizing the coworker. Ms. Thompson also noticed Ms. Lund "never was interested" in learning about Russia and "her face expression wasn't pleasant" when Ms. Thompson would share things about her country. *Id.* at 330. Ms. Thompson only suspected two employees at Little America, Ms. Lund and a gift store salesperson, Ms. Kounalis, of "harbor[ing] some type of discriminatory animus against [her] national origin." *Id.* at 369.

Following Ms. Lund's promotion, she and Ms. Thompson clashed regularly. Ms. Lund used a Little America form titled "Keys to Success: Performance Coaching" to document issues with Ms. Thompson's work. *See, e.g.*, App. Vol. I at 188. She filled out at least thirteen of these forms—although they were not signed by Ms. Thompson and Ms. Thompson only acknowledged receiving copies of three of the performance coaching forms from February and March 2017. In her deposition, Ms. Thompson acknowledged most of the incidents that were described in the performance coaching forms and remembered being "scolded" by Ms. Lund but denied ever seeing the forms prior to a meeting with upper management in February 2017. App. Vol II at 316–17, 318.

Ms. Lund completed performance coaching forms about Ms. Thompson during her two years supervising her for a variety of issues. In a couple of the forms, she wrote Ms. Thompson was not completing her duties as supervisor, such as accepting customer refunds and handling assignments efficiently. In other coaching forms,

Ms. Lund documented attendance issues—stating Ms. Thompson did not show up for a scheduled shift and on another occasion she did not use proper channels to report she was staying home sick. Ms. Lund also documented Ms. Thompson's violation of Little America rules, such as parking on hotel grounds and talking on her phone during work. Finally, Ms. Lund documented complaints from Ms. Thompson's coworkers about Ms. Thompson's criticism of their work; frequent reporting of items going missing on coworkers' shifts that later turned up in the store; and taking commissions as the supervisor when there was a salesperson on the floor.

Ms. Thompson stated in her deposition she remembered most of these incidents but denied having reviewed or received the coaching forms. In response to coaching forms about her not handling her tasks as a supervisor, she claimed Ms. Lund had told her not to accept refunds when Ms. Lund was not in the store. She admitted to talking on the phone at work and parking at times on grounds in violation of the rules. She also admitted to taking sales commissions while working with a salesperson, but she claimed Mr. Mundel did not tell her until February 2017 that as a supervisor she had to let the assigned salesperson handle sales and receive commissions. Ms. Thompson claimed Ms. Lund treated her differently from her coworkers and had three favorite employees, none of whom were Russian, who Ms. Lund would not report for breaking rules. She also suspected Ms. Lund wrote her up so frequently because Ms. Lund disliked Russians.

Ms. Lund recorded in several of the coaching forms that Ms. Thompson was not receptive to criticism. Ms. Thompson often responded to criticism by saying she

6

was doing the same thing that Ms. Lund had done when she was a supervisor or that her coworkers were lying about her. Ms. Lund wrote on a few of the coaching forms that Ms. Thompson refused to sign the forms or that Ms. Lund felt she needed to have a third party present to talk with Ms. Thompson. Ms. Thompson stated in her deposition it was her practice not to sign any coaching form that she disagreed with but to wait and respond with a written reply. She stated she never saw a coaching form until February 2017 and found it "extremely strange" there were so many coaching forms she had never seen. *Id.* at 328. Although unsigned, several of the forms Ms. Thompson claims she did not receive include Ms. Lund's description of Ms. Thompson's response to the coaching.

Due to Ms. Lund's inability to resolve the issues with Ms. Thompson, she sought assistance from upper management. By the end of 2016, Scott French, the hotel manager, and Mr. Mundel, the general manager, had become involved in coaching Ms. Thompson. Mr. Mundel, Mr. French, and Carl Sokia, the human resources director, met with Ms. Thompson in February 2017 to discuss a complaint from one of the salespeople, Ms. Kounalis, about Ms. Thompson taking sales from her. In this meeting, they told Ms. Thompson that when she was scheduled to work as a supervisor and someone else was scheduled as a salesperson on the floor, she was to allow the scheduled salesperson to take all commissions. Ms. Thompson stated in her deposition she remembered this meeting and that it was the first time she was informed of this rule. Ten days after this conversation, Ms. Thompson again took a sale when Ms. Kounalis was working as the scheduled salesperson. Ms. Thompson

7

admitted in her deposition to taking the sale and said it was a mistake out of habit. Ms. Lund, Mr. French, and Mr. Mundel met with Ms. Thompson in March 2017 to discuss Ms. Thompson violating the rule. Ms. Thompson was upset following the meeting and went to discuss the issue with the CEO of Little America and attempted to visit the owner of the hotel at the owner's home. Mr. Mundel wrote her up for breaking the chain of command by taking her complaint to the CEO and owner.

Over the next year, Mr. Mundel continued to hear Ms. Thompson was violating rules he and Ms. Lund had previously warned her about, such as parking on grounds, using her cell phone, and refusing to discuss all issues with her supervisor, Ms. Lund. In March 2018, Ms. Thompson's coworker, George Rowe, wrote a letter to management reporting Ms. Thompson had threatened him after he helped her with a computer issue, stating "that [he] better not backstab her because she has a lot on him." App. Vol. I at 230. Ms. Thompson stated in her deposition that Mr. Rowe misunderstood their conversation, and she had not threatened him. Due to Mr. Rowe's complaint, Ms. Lund, Mr. French, and Mr. Mundel met together with Ms. Thompson to discuss how she interacts with her coworkers. Mr. Mundel asked Ms. Thompson to not counsel or criticize her coworkers and to focus on being positive with her team for the next ninety days. Ms. Thompson stated in her deposition she remembered this conversation and committed to following this instruction.

The following month, Ms. Thompson had a disagreement with her coworker Ms. Kounalis. Ms. Thompson noticed two empty hangers following Ms. Kounalis's

8

shift but only one correlating sale. Ms. Thompson placed the empty hangers on the counter, which Ms. Kounalis interpreted as an accusation. Ms. Kounalis confronted Ms. Thompson about leaving the hangers out. Ms. Kounalis reported to Mr. Mundel "that she felt harassed by [Ms. Thompson] and that there had been three or four recent instances in which she felt that she was nit-picked on her shift." *Id.* at 161. Mr. Mundel and Mr. French met with Ms. Thompson about the incident, and Mr. Mundel reminded her of his previous instruction not to counsel or criticize her coworkers. He wrote in the performance coaching form about the incident, "[he] reiterated again that [he] did not want her to counsel any of the team members without [Ms. Lund]." *Id.* at 161–62, 224. He told Ms. Thompson "[he] trust[ed] everyone on this team" and to "give folks the benefit of the doubt." *Id.* He also told Ms. Thompson "the stress other coworkers feel when you are around is not good and has to change somehow." *Id.*

Six days later, Ms. Thompson left two notes for the other gift shop supervisor, Mr. Rowe, discussing his work. In one of the notes, Ms. Thompson stated she had seen Mr. Rowe on his phone in violation of company policy, and in the other that she had heard from a long-time customer Mr. Rowe had been rude in an interaction with her. In the note regarding the customer complaint, Ms. Thompson wrote, "If this type of behavior continues, I will have to report you to upper management." *Id.* at 242. Ms. Thompson did not consider the notes to be criticism but friendly letters to a coworker. Mr. Rowe complained to Mr. Mundel, bringing him Ms. Thompson's notes and writing a letter himself, stating "[he] f[ou]nd [himself] at a crossroads after 21

9

years that [he's] contemplating finding other employment" because "[he] c[ould] not accept that any employee should have to tolerate behavior from employees that makes the environment unsettling." *Id.* at 234.

Mr. Mundel viewed Ms. Thompson's notes to Mr. Rowe, written six days after he met with her about not counseling or criticizing her coworkers, as Ms. Thompson "directly and deliberately disobey[ing] [his] specific instructions to her." *Id.* at 163. Concerned about the morale and efficiency of the Retail Department, "[he] determined that it was in Little America's best interest to terminate [Ms.] Thompson's employment." *Id.* He stated in his declaration that he discussed the situation with Mr. French, but not Ms. Lund, and made the decision to terminate Ms. Thompson's employment on his own. He also stated Ms. Thompson's national origin had nothing to do with the decision. Ms. Thompson stated in her deposition she did not suspect Mr. Mundel or Mr. French of discriminating against her based on her national origin.

After exhausting her administrative remedies, Ms. Thompson brought suit, with her operative complaint alleging (1) Little America discriminated against her on the basis of her national origin in violation of Title VII and (2) Little America retaliated against her for reporting discrimination. Little America moved for summary judgment on both claims, arguing Ms. Thompson "[could] not establish the *prima facie* elements of either claim she asserts," and, alternatively, Ms. Thompson had not produced "evidence upon which a jury could reasonably infer that Little

America's stated reasons for [Ms.] Thompson's termination are a mere pretext for discrimination or retaliation." *Id.* at 38–39.

The district court granted Little America's motion for summary judgment on both claims. Addressing the discrimination claim, the court determined Ms. Thompson had not produced any evidence to dispute that Mr. Mundel was the sole decisionmaker regarding her termination and he terminated her due to "concern[s] about [her] ability to work with others and follow directions." App. Vol. II at 458–59. The court held that even assuming she had established a prima facie case of discrimination, but also commenting that she likely had not, there was no genuine question of material fact as to the reason for her termination. The court also held Ms. Thompson had not established a prima facie case of retaliation because the only report she alleged to have made of discrimination took place after she was terminated.

The district court entered its judgment on January 6, 2022, and Ms. Thompson timely filed her notice of appeal on February 2, 2022. Ms. Thompson does not discuss her retaliation claim in her brief on appeal and only appeals the district court's decision on her discrimination claim.

## II.    DISCUSSION

### A.    *Standard of Review and* **McDonnell Douglas** *Framework*

Reviewing the district court's grant of summary judgment, "[w]e conduct de novo review and uphold summary judgment only in the absence of a genuine dispute of material fact." *Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1196

(10th Cir. 2021). In other words, we will affirm the district court "only if our independent review of the record, viewing the facts in the light most favorable to [Ms. Thompson], reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1207 (10th Cir. 2010); *see also* Fed. R. Civ. Proc. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

Ms. Thompson brought a Title VII claim alleging disparate treatment by Little America on the basis of national origin. *See* 42 U.S.C. § 2000e-2(a) ("It shall be an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's . . . national origin.") Title VII discrimination claims can be proven "through either direct evidence of discrimination (e.g., oral or written statements on the part of a defendant showing a discriminatory motivation) or indirect (i.e., circumstantial) evidence of discrimination." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000). Ms. Thompson relied on the latter of these options, relying only on indirect evidence of discrimination.

When a plaintiff bases her claim on indirect evidence of discrimination, she can establish her claim by relying on the burden-shifting test established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, the burden shifts from the plaintiff to the

12

employer and then back to the plaintiff through a three-step process. 411 U.S. at 802–04.

First, the plaintiff has the burden to present a prima facie case of discrimination. *Id.* at 802. To build a prima facie case, a plaintiff must demonstrate that "(1) [she] belongs to a protected class; (2) [she] suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." *EEOC v. PVNF, LLC.*, 487 F.3d 790, 800 (10th Cir. 2007). "An inference of discrimination can arise" when an employer has treated a similarly situated employee, who is not part of the protected class, more favorably than the plaintiff. *Ibrahim*, 994 F.3d at 1196. To be considered similarly situated, an employee must "share a supervisor or decision-maker, must follow the same standards, and engage in comparable conduct" as the plaintiff. *Id.*

If the plaintiff establishes her prima facie case, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse employment action. *PVNF*, 487 F.3d at 800. Once the employer provides a legitimate, nondiscriminatory reason for the adverse employment action, "the burden shifts back to the plaintiff to show that there is a genuine issue of material fact as to whether the employer's proffered reasons are pretextual." *Id.* A plaintiff can create a question of fact as to pretext by showing the employer's legitimate, non-discriminatory reasons for the adverse action "are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude they are unworthy of belief." *Johnson*, 594 F.3d at 1211 (internal quotation marks omitted). The question

is not "whether the employer's decision was wise, fair or correct, but whether it honestly believed the legitimate, nondiscriminatory reasons it gave for its conduct and acted in good faith on those beliefs." *Id.* (internal quotation marks omitted).

### B.    Analysis

We affirm the district court because no reasonable juror could conclude Little America's stated reasons for terminating Ms. Thompson were mere pretext. Like the district court, we assume without deciding that Ms. Thompson has met her step one burden under *McDonnell Douglas* to establish a prima facie case of discrimination.[1] But regardless, she has not satisfied her burden on step three. There is a key disconnect between Ms. Thompson's allegations of discrimination and her termination—she accused Ms. Lund of holding animus towards Russians, but not Mr. Mundel, the decisionmaker responsible for her termination.

To overcome this, Ms. Thompson argued Ms. Lund's discriminatory animus was the cause of her termination through a "cat's paw" theory of liability.[2] But under

---

[1] Little America satisfied its step two burden by stating its legitimate, nondiscriminatory reasons for terminating Ms. Thompson's employment, and she has not argued on appeal that Little America failed to meet its step two burden.

[2] Ms. Thompson's brief on appeal refers to Ms. Lund "contaminat[ing]" Mr. Mundel's decision and the "cat's paw" theory, but she cites no legal authority to support her argument. *See* Appellant's Br. at 28–32. Under Federal Rule of Appellate Procedure 28(a)(8)(A), an appellant's arguments "must contain . . . appellant's contentions and the reasons for them with citations to the authorities and parts of the record on which the appellant relies." We have previously declined to consider arguments when appellants fail to tie their arguments to any authority. *See In re: Motor Fuel Temperature Sales Pracs. Litig.*, 872 F.3d 1094, 1114 n.7 (10th Cir. 2017); *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1547 (10th Cir. 1995). While we

14

our case law, when a third party decides to terminate an employee based on an independent review of the employee's actions, that decision cannot be attributed to a subordinate's bias. Because Ms. Thompson has produced no evidence to dispute that Mr. Mundel independently made the decision to terminate her employment, or disputing his stated legitimate reasons for her termination, she has not met her burden to create a genuine question of fact as to whether Little America's stated reasons for her termination were pretextual.

Under the "'cat's paw' theory of liability," a plaintiff can "establish pretext even without evidence that the 'actual decisionmaker' possessed an unlawful motive." *Singh v. Cordle*, 936 F.3d 1022, 1038 (10th Cir. 2019). But the plaintiff must show that "one of [the employer's] agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision." *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011). In other words, to survive summary judgment based on the cat's paw theory of liability, Ms. Thompson "must show that there is a genuine issue of material fact that (1) [Ms. Lund] took action motivated by discriminatory animus; (2) [Ms. Lund] intended the action to cause an adverse employment action, and (3) [Ms. Lund's] actions proximately caused the intended adverse employment action." *Singh*, 936 F.3d at 1038 (citing *Staub*, 562 U.S. at 422).

---

are exercising our discretion to address Ms. Thompson's cat's paw theory argument, we note that appellants are expected to support their arguments with legal authorities.

We have consistently held plaintiffs cannot rely on the cat's paw theory of liability when an unbiased third party independently reviews an employee's performance and makes the decision to terminate her employment. In *Pinkerton v. Colorado Department of Transportation*, we considered whether a manager's decision to terminate the plaintiff's employment could be attributed to the plaintiff's direct supervisor through the cat's paw theory when the manager partially relied on reports prepared by said supervisor to make the termination decision. *See* 563 F.3d 1052, 1060 (10th Cir. 2009). We held that because the manager independently met with the employee and provided her an opportunity to "give her side of the story," this was "sufficient to defeat any inference that the decision was based on a subordinate's bias." *Id.* at 1061. In *Singh v. Cordle*, we held that "[o]ne way an employer can 'break the causal chain' between the subordinate's biased behavior and the adverse employment action is for another person or committee higher up in the decision-making process to independently investigate the grounds for dismissal." 936 F.3d at 1038; *see also Lobato v. New Mexico Env't Dep't*, 733 F.3d 1283, 1294 (10th Cir. 2013) ("[I]f the employer independently verifies the facts and does not rely on the biased source—then there is no subordinate bias liability.").

Even assuming Ms. Thompson has produced sufficient evidence to satisfy the first two elements of the cat's paw test, she has produced no evidence to demonstrate Ms. Lund's actions proximately caused Mr. Mundel to terminate her employment. Mr. Mundel began meeting with Ms. Thompson directly a year prior to deciding to terminate her employment. When he initially started coaching Ms. Thompson, he

16

expressed optimism that her conflicts with her coworkers could be resolved. So although Ms. Lund caused Mr. Mundel to become involved in Ms. Thompson's supervision, her actions did not lead to Ms. Thompson's termination. Rather, Mr. Mundel did not decide to terminate Ms. Thompson's employment until a year later, when Ms. Thompson had directly disobeyed his coaching instructions multiple times.

Little America has produced evidence—including Mr. Mundel's declaration, coaching forms, written complaints from a coworker, and parts of Ms. Thompson's deposition—showing Ms. Thompson violated Mr. Mundel's instructions not to take commissions from salespeople when working as a supervisor and not to counsel or criticize her coworkers. Ms. Thompson has produced no evidence to dispute Mr. Mundel's explanation of her termination, other than stating she did not consider the notes she left for Mr. Rowe to be offering counsel or criticism. She has not disputed the content or authenticity of the letters—the first of which told Mr. Rowe she saw him using his phone in violation of Little America rules and the second warned him she would report him to upper management if he did not improve his demeanor with customers. Even viewing the facts in the light most favorable to Ms. Thompson, these letters indisputably contained counsel and criticism.[3]

---

[3] *See Counsel*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/counsel (last visited Oct. 7, 2022) (defining "counsel" as "advice given especially as a result of consultation"); *see also Criticism*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/criticism (last visited Oct. 7, 2022) (defining "criticism" as "the act of criticizing usually

17

Mr. Mundel decided it was in Little America's best interest to end Ms. Thompson's employment because she disobeyed his coaching instructions on multiple occasions—not because of Ms. Lund's coaching forms about Ms. Thompson. It is also undisputed that Mr. Mundel did not discuss the decision to terminate Ms. Thompson's employment with Ms. Lund. Mr. Mundel, a higher-up manager, broke any causal chain between Ms. Lund's alleged bias and the termination of Ms. Thompson's employment when he stepped in, meeting with Ms. Thompson directly, providing her coaching instructions, and eventually terminating her employment when she repeatedly disobeyed his instructions. *See Singh*, 936 F.3d at 1038. And because Mr. Mundel has provided legitimate reasons for terminating Ms. Thompson's employment, and she has not alleged that he held any discriminatory animus, no reasonable juror could conclude these stated reasons for her termination were pretextual.

---

unfavorably"); *Criticize*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/criticize (last visited Oct. 7, 2022) (defining "criticize" as "to consider the merits and demerits of and judge accordingly" or "to find fault with : point out the faults of"). By instructing Mr. Rowe that he should not be using his phone while working and to improve his demeanor with customers, Ms. Thompson's words fell squarely within these definitions—giving Mr. Rowe advice, judging his actions, and finding fault with his actions.

## III.    CONCLUSION

We AFFIRM the district court's grant of Little America's motion for summary judgment.

Entered for the Court


Carolyn B. McHugh
Circuit Judge